UNITED STATES of America, Appellee,

v.

Peter VARIO, Michael LaBarbara, Jr., James G. Abbatiello, and Silvestro Spilabotte, Defendants,

Peter Vario, Defendant–Appellant.

No. 579, Docket 90–1416.

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1991.

Decided Sept. 3, 1991.

Richard A. Friedman, Dept. of Justice, Washington, D.C. (Andrew J. Maloney, New York City, U.S. Atty. E.D. New York, of counsel), for appellee.

Brian D. Linder, New York City (Samuel H. Dawson, Gallop Dawson, Claymon & Rosenberg, Bruce Cutler, of counsel), for defendant-appellant.

Before OAKES, Chief Judge, and CARDAMONE and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Peter Vario appeals from a judgment entered in the United States District Court for the Eastern District of New York (Jacob Mishler, *Judge*), following a jury trial, convicting him of one count of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(d) (count one), and thirteen counts of violating the Taft–Hartley Act, 29 U.S.C. 186(b)(1) (counts two through fourteen). On appeal, Vario contends that: (1) the unwarranted use of an "anonymous jury" deprived him of the presumption of innocence and right to an impartial jury; (2) a tape was wrongly admitted into evidence in violation of 18 U.S.C. § 2518(8)(a); and (3) certain wiretap evidence should have been suppressed because amendments to the eavesdropping warrants used to obtain the evidence violated 18 U.S.C. § 2517(5). For the reasons below, we affirm the judgment of conviction.

## BACKGROUND

From 1978 to 1989 Peter Vario was a leader of the General Building Laborers Local 66 of the Laborers' International Union of North America ("Local 66"). During those years, he held several different positions with Local 66, acting as an organizer, then a vice-president and later a Funds Administrator of the union's employee welfare benefits fund. Local 66, which has approximately 1200 active members, represents all laborers involved in building construction and concrete work in Nassau and Suffolk counties of New York state.

Count one of a superseding indictment issued on April 20, 1989 charged Vario, Michael LaBarbara, Jr., the business manager of Local 66, James G. Abbatiello, the assistant business manager of Local 66, and Silvestro Spilabotte, the owner of a concrete company, with conspiracy to conduct the affairs of Local 66 through a pattern of racketeering activity in violation of 18 U.S.C. 1962(d). The indictment charged that Vario and the others had committed sixty-nine acts of racketeering in furtherance of the conspiracy, including the solicitation and receipt of payoffs from contractors in violation of the Taft–Hartley Act, 29 U.S.C. 186, and one act of obstruction of justice. Counts two through fourteen of the indictment alleged that the defendants had received money from concrete contractors in violation of the Taft–Hartley Act, 29 U.S.C. 186.

Prior to trial, Vario's co-defendants pled guilty. Vario's trial centered on allegations that he and others had engaged in a scheme to extort money from concrete contractors. In return for these payments, concrete contractors were permitted to violate prevailing collective bargaining agreements. Resistance to payment demands was met by economic reprisals from the union and other union-controlled entities, including concrete suppliers. There was also evidence at trial that Vario was a member of the Lucchese organized crime family and that high-ranking members of

the Lucchese group furthered Vario's extortion scheme by settling disputes that arose under the scheme and shared in the scheme's payoffs.

The jury found Vario guilty on all counts and found $88,300 forfeitable. Judge Mishler sentenced him to concurrent terms of imprisonment of 46 months on each of the fourteen counts, ordered the $88,300 forfeited, imposed a fine of $50,000, an assessment of the cost of imprisonment and a three year term of supervised release. This appeal followed.

## DISCUSSION

### I. *Anonymous Jury*

During a pre-trial status conference, the district court suggested that it might be appropriate to conceal the jurors' identities in light of the obstruction of justice charge, which involved a conversation between co-conspirator Abbatiello and a grand jury witness. The government followed with a motion to that effect. The district court granted the government's motion to empanel an "anonymous jury"—one in which jurors did not reveal their names, addresses, or places of work to the parties or counsel.

Vario's primary contention on appeal is that the use of an anonymous jury infringed his due process right to a fair trial and his Sixth Amendment right to an impartial jury by depriving him of the presumption of innocence and impairing his effective exercise of peremptory challenges. We reject this argument.

We have had several occasions in recent years to consider the issue of "anonymous juries." In a line of decisions, we have held that when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights. *See, e.g., United States v. Tutino,* 883 F.2d 1125 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Persico,* 832 F.2d 705 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Ferguson,* 758 F.2d 843 (2d Cir.), *cert. denied,*

474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 102 (1985); *United States v. Thomas,* 757 F.2d 1359 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985); *United States v. Barnes,* 604 F.2d 121 (2d Cir. 1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

In *United States v. Thomas,* 757 F.2d 1359, 1365 (2d Cir.1985), we outlined the basic standard for determining when the use of an anonymous jury is constitutional: "there must be, first, strong reason to believe that the jury needs protection and, second, reasonable precaution must be taken to minimize the effect that such a decision might have on the jurors' opinions of the defendants." Vario's principal challenge focuses on the first of these requirements. We review his claim bearing in mind that the empaneling of an anonymous jury and its potential impact on the constitutionality of a trial must "receive close judicial scrutiny and be evaluated in the light of reason, principle and common sense." *Id.* at 1363.

### A. *Was the use of an anonymous jury warranted in this case?*

In the district court, the government argued that three factors warranted the use of an anonymous jury in this case. First, it argued that Vario was a member of the Lucchese organized crime family and that recent events in another organized crime trial showed the sensitivity of jurors to intimidation by organized crime. Second, it noted that Vario's co-conspirator had used grand-jury tampering as one method of furthering the RICO conspiracy, and finally, it contended that the jurors would be intimidated by publicity surrounding the case. Judge Mishler explicitly relied on the first two of these reasons in his decision to empanel an anonymous jury. He remarked that the government had offered proof that Vario was a member of the Lucchese family and that this family, through Vario, participated in the affairs of Local 66. Judge Mishler then reasoned that "[t]he recent experience of jury tampering in the case of *United States v. Gotti,*" an unrelated organized crime trial, coupled with the obstruc-

tion of justice charge against one of the co-conspirators, called for an anonymous jury.

We are satisfied that two circumstances surrounding this case, the grand jury tampering charge and the expected publicity, justified the trial court's decision to empanel an anonymous jury. However, as we will explain below, we reject the trial court's reasoning insofar as it relied on Vario's organized crime connections.

Vario contends that we should not accord any weight to the obstruction of justice incident both because it was his co-conspirator Abbatiello, not Vario, who actually approached a grand jury witness and because the grand jury witness was Abbatiello's friend. We reject both arguments.

■ An obstruction of justice charge, particularly one involving jury tampering, has always been a crucial factor in our decisions regarding anonymous juries. *See, e.g., United States v. Tutino*, 883 F.2d 1125, 1132–33 (2d Cir.1989) (history of jury tampering attempt when coupled with defendant's serious criminal records, was sufficient to justify the empaneling of an anonymous jury); *Thomas*, 757 F.2d at 1365 (justifying anonymous jury because of "strong evidence of defendants' past attempts to interfere with the judicial process, and [because] defendants were alleged to be part of a group that possessed the means to harm jurors").

Although Vario may not have personally spoken to the grand jury witness, his co-conspirator took the act in furtherance of the conspiracy. Since it is a fundamental tenet of the law of conspiracy that reasonably foreseeable acts of individual co-conspirators taken in furtherance of the conspiracy count against all members equally, Vario's argument is unavailing. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Bruno*, 873 F.2d 555, 560 (2d Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989). We find irrelevant Vario's further contention that we should somehow disregard this incident because of the prior relationship between the grand jury witness and Abbatiello. Rather, this event demonstrated the willingness of the conspirators to tamper with the judicial process.

■ Vario also argues that the publicity surrounding this case was so minimal that it did not warrant an anonymous jury. We are unpersuaded. Pre-trial publicity may militate in favor of an anonymous jury because it can "enhance the possibility that jurors' names would become public and thus expose them to intimidation by defendants' friends or enemies, or harassment by the public." *United States v. Persico*, 621 F.Supp. 842, 878 (S.D.N.Y.1985). At the time of the government's anonymous jury motion in the district court, *New York Newsday* had recently published a cover story about the case entitled *The Mob and Local 66*. The story detailed the extensive nature of the conspiracy charged which was said to affect virtually all of the construction industry on Long Island. Although no publicity followed this initial article, we cannot say that at the time that the anonymous jury motion was made, the government's prediction that publicity would continue was unreasonable or unjustified. While later developments may have proved this prediction wrong, we cannot say, viewing the situation as it was then presented to the trial judge, that there were insufficient grounds to believe that this case warranted the use of an anonymous jury. *See United States v. Persico*, 832 F.2d at 717 (2d Cir.1987) (" 'extensive publicity this case is *expected* to continue to attract' " supported use of anonymous jury) (emphasis supplied); *United States v. Barnes*, 604 F.2d 121, 141 (2d Cir.1979) ("in a case that generated as much pretrial publicity as this one did and in which allegations of dangerous and unscrupulous conduct abounded," anonymous jury served valid purpose).

■ Although we find that the district court did not err in deciding that the circumstances of this case warranted an anonymous jury, the additional reason that the district court gave to justify its decision was erroneous. If it had been the sole reason advanced, a reversal would have been in order. Specifically, the district court noted the government's evidence link-

ing Vario to the Lucchese crime family, and stated that "[t]he recent experience of jury tampering in the case of *United States v. Gotti*," an unrelated organized crime trial, was a factor warranting an anonymous jury.

The invocation of the words "organized crime," "mob," or "Mafia," unless there is something more, does not warrant an anonymous jury. This "something more" can be a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendants and his associates such as would cause a juror to reasonably fear for his own safety. Such proof would be sufficient in and of itself in an appropriate case to warrant an anonymous jury regardless of whether the defendant was a reputed mobster or associated with a recognized organized crime family.

To be sure, the specter of organized crime has played into our previous decisions to uphold the use of anonymous juries, but in these decisions, it was the reasonable likelihood of juror intimidation, not the incantation of the words "the mob" or "organized crime," that prompted the anonymous jury. *See United States v. Tutino*, 883 F.2d 1125, 1132–1133 (2d Cir.1989) (defendants' serious criminal records and history of jury tampering); *United States v. Persico*, 832 F.2d 705, 717 (2d Cir.1987) (" 'violent acts alleged to have been committed in the normal course of Colombo Family business' "); *United States v. Thomas*, 757 F.2d 1359, 1364 (2d Cir.1985) (history of violence—"mob-style" killings—bore directly on the issue of juror safety or fear of reprisal).

In this case, we find that the district court erred insofar as it simply referred to another Mafia trial as support for its decision. Although evidence about the role of organized crime in the payoff scheme was certain to be relevant at Vario's trial, the essence of the government's case was that the scheme was enforced by economic reprisals, not intimidating acts such as would bear on the issue of juror safety or fear.

The district court made no findings that demonstrated Vario's organized crime connection to be directly relevant to the issue of an anonymous jury. Consequently, the district court's reference to another organized crime trial as evidence that Vario's connection to the Lucchese crime family would intimidate jurors was neither logical nor relevant. Before a district judge may rely on the organized crime connection of a defendant as a factor in the question of anonymous juries, he must make a determination that this connection has some direct relevance to the question of juror fears or safety in the trial at hand, beyond the innuendo that this connection conjures up. In this case, although we find that the district court erroneously relied on Vario's organized crime connection as a basis for its decision to empanel an anonymous jury, we nonetheless affirm the decision based on the other grounds discussed above.

*B. Did the Use of the Anonymous Jury Prejudice Vario's Peremptory Challenges or Burden His Presumption of Innocence?*

 Vario contends that even if this case warranted the empaneling of an anonymous jury, the court took insufficient precautions to safeguard his presumption of innocence and his right to a fair and impartial jury through the meaningful exercise of peremptory challenges. These arguments are without merit.

Although the district judge here did not instruct the jury in order to explain their anonymity, there is no reason to believe that the absence of instructions led the jurors to conclude other than that "[i]t is a common practice" to keep jurors' names and identities in confidence, an instruction we approved when given explicitly in *United States v. Tutino*, 883 F.2d 1125, 1133 (2d Cir.1989). Furthermore, Vario did not object to the court's charge to the jury and therefore waived his right to explicit instructions. In any event, the district court fully instructed the jurors on the presumption of innocence.

In addition, the district court conducted a searching *voir dire* which sufficiently en-

abled Vario to exercise his challenges meaningfully and to obtain a fair and impartial jury. *See id.* at 1133. As we explained in *United States v. Barnes,* 604 F.2d 121, 140 (2d Cir.1979), "[a]s long as a defendant's substantial rights are protected by a *voir dire* designed to uncover bias as to issues in the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal."

## II. *Admissibility of Surveillance Tape*

Vario contends that the government unduly delayed in resealing an electronic surveillance tape, tape 1077, the two times it was handed to the government under court order for duplication and enhancement, and that the government failed to satisfactorily explain such delay in violation of 18 U.S.C. § 2518(8)(a) of the Omnibus Crime Control and Safe Streets Act which governs the procedures for the initial sealing, storage and duplication of oral, wire and electronic surveillance evidence. We disagree.

On May 15, 1984 and again on May 23, 1985, pursuant to procedures under 18 U.S.C. § 2518(8)(a), New York State Supreme Court Justice Burton Roberts authorized the duplication and enhancement of certain tape recordings made pursuant to a surveillance order. One of these was the tape at issue here, tape 1077, which records a July 1, 1983 conversation between Vario and another man during which Vario discussed a $21,000 payoff. After being unsealed pursuant to Justice Roberts' May 15 order, tape 1077 was judicially resealed along with other tapes on June 11, 1984. Tape 1077 was unsealed again pursuant to the May 23, 1985 order, and judicially resealed by Justice Roberts on June 20, 1985. Both duplication orders issued by the judge provided *inter alia* that "as soon as possible [after duplication] the original tapes are to be returned to the Court for resealing." Vario moved to suppress the tapes, contending that it took the government approximately 28 days each time to process the tapes and that it failed to satisfactorily explain the delay. The district court found that after both unsealings, tape 1077 was

resealed in its original condition and was not subject to any tampering. It further found that the government had satisfactorily explained any delay. The district court therefore denied Vario's motion to suppress. We cannot fault the district court's decision.

Section 2518(8)(a) provides *inter alia:* "[i]mmediately upon the expiration of the period of the [surveillance] order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." The section further provides that "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom...." *Id.*

The Supreme Court recently considered § 2518(8)(a) in *United States v. Ojeda Rios,* 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990). Noting that Congress passed this section in order to ensure the reliability and integrity of evidence obtained by means of electronic surveillance, the Court determined that § 2518(8)(a) applies to cases where the government has delayed in initially sealing recordings as well as to cases where no seal was ever applied to a recording. Where the section does apply, *Rios* further held that the government must offer a "satisfactory explanation" why a delay occurred and why it is excusable.

Vario argues that *Rios* applies not only to the initial sealing of tapes but also to the unsealing and *re*-sealing of tapes for duplicating purposes after they have come under judicial control pursuant to § 2518(8)(a). He argues that § 2518(8)(a) mandates that any post-unsealing use of wiretap evidence capable of compromising its physical integrity must be satisfactorily explained before it can be used in evidence.

■ We need not reach this question, however, because we note that even if we were to adopt Vario's construction of § 2518(8)(a), the district court made an express finding, supported by the record, that

the government had satisfactorily explained the delays involved here. There was ample evidence that entitled the district court to reach this conclusion: during the 1983 unsealing the technical staff responsible for duplication had been witnesses in other trials; the government also presented evidence that the duration of unsealing was considerably shorter than the usual time required by the FBI lab to accomplish the task, given the backlog of requests. Of course, regardless of whether § 2518(8)(a) applies to resealing delays, if unsealing or resealing had compromised the integrity or reliability of a tape, suppression would result. *United States v. Long,* 917 F.2d 691, 700 (2d Cir.1990); *United States v. Angiulo,* 847 F.2d 956, 978 (1st Cir.1988). However, the district court made a finding, unchallenged on appeal, that the tapes had not been tampered with and were returned in their original condition. Accordingly, the tapes were properly received in evidence.

### III. *Amendments to Eavesdropping Warrants*

Vario argues that the government's applications to amend certain eavesdropping warrants to include certain conversations not relating to offenses cited in the original warrant violated 18 U.S.C. § 2517(5) and New York Criminal Procedure Law § 700.-65(4) because they were not submitted as soon as practicable and because they did not adequately convey underlying facts and that evidence obtained pursuant to the warrants should have been suppressed. We disagree.

Section 2517(5) governs the disclosure of information obtained by lawfully authorized electronic surveillance. It provides that when a conversation is intercepted "relating to offenses other than those specified in the order of authorization or approval, the contents thereof" may be disclosed in federal proceedings when such disclosure is "authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as

soon as practicable." The purpose underlying this section is to ensure that "the original order ... was sought in good faith and not as [a] subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." S.Rep. No. 1097, 90th Cong., 2d Sess. 12, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2189. New York Criminal Procedure Law § 700.-65(4) also has an "as soon as practicable" requirement.

Vario argues that the government did not submit applications "as soon as practicable" to use in evidence two groups of tapes, the "Sant'Oro" and "Avellino" tapes. Both sets of tapes resulted from a New York State Organized Crime Task Force (OCTF) investigation of the Long Island private carting industry. The OCTF later shared the tapes intercepted during this surveillance with federal authorities, who in turn procured amendments to the original eavesdropping warrants in order to use the tapes as evidence in this case.

We find that the district court did not err in determining that the government's applications to amend were filed "as soon as practicable" for purposes of § 2517(5). The "as soon as practicable" requirement of § 2517(5) should be construed "in a common sense fashion," *United States v. Marion,* 535 F.2d 697, 707 (2d Cir.1976). Here, while the government possessed the Sant'Oro tapes for four years, it became aware of their relevance to the instant case seven months prior to the government's application to amend, as Vario concedes in his reply brief. Vario does not assert a delay greater than seven months with respect to the Avellino tape. Comparable delays under factually similar circumstances have been upheld on appeal, *United States v. Van Horn,* 789 F.2d 1492 (11th Cir.1986) (22 month total delay, 5 months from when federal law enforcement learned of wiretap); *United States v. Southard,* 700 F.2d 1 (1st Cir.1983), *cert. denied,* 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (19 month delay).

Here, the parties dispute the extent of the delay. Vario submits that the government delayed for seven months before fil-

ing an application to use the Avellino tapes and that the Sant'Oro application delay "might be calculated at anywhere from seven months to four years." However, the government argues that although it had access to the Sant'Oro tapes for several years, the relevance of the tapes to its investigation of Local 66 became clear much later, only seven months before it applied for the amendment to the original eavesdropping order. It was then that newly developed witnesses appeared who explained key events under discussion on the tape recordings. In his reply brief, Vario argues only that "the government's application was submitted approximately seven months after it was practicable to do so," and thus appears to concede that the delay was in fact seven months. We do not think the district court erred in determining that this delay conformed with the "as soon as practicable" requirement, particularly where Vario does not allege any prejudice from the delay or that the state wiretap was a subterfuge to generate evidence for federal charges. *See United States v. Van Horn*, 789 F.2d 1492, 1504 (11th Cir.1986) (test for what constitutes excessive delay under § 2517(5) depends not only on length of delay, but also on whether delay implicated statutory policy to prevent subterfuge); *see also Southard*, 700 F.2d at 30 (approving 19 month delay where government explained hiatus by stating that conversations' relevance "has only become apparent upon a recent analysis").

We also reject Vario's contention that the government applications must satisfy the requirements of New York Criminal Procedure Law § 700.65(4) in addition to the requirements of 18 U.S.C. 2517(5). Both the federal and state statute use the same "as soon as practicable" language. Vario asserts, however, that the New York cases have interpreted the "as soon as practicable" requirement more strictly than the identical federal statutory language. We need not decide that issue, however, because in *United States v. Sotomayor*, 592 F.2d 1219, 1225 (2d Cir.1979), we stated that

in determining whether to admit a wiretap obtained by a state officer acting under a state court order issued pursuant to a state statute, ... [federal courts need] apply only those more stringent state statutory requirements or standards that are designed to protect an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character.

*Sotomayor* thus set up a distinction between procedures governing the interception of wiretap evidence and those post-interception procedures that relate to the preservation of such evidence.

Since both the Federal Act and New York Criminal Procedure Law § 700.65(4) govern the disclosure of already intercepted communications, these requirements are procedural rules "essentially evidentiary in character." *Sotomayor*, 592 F.2d at 1225–26. Since a government delay in applying to use communications in evidence under these rules does not bear on a defendant's privacy rights, *Sotomayor* does not require the application of state law to the question of such delay, and we need not consider whether the government's applications complied with New York law.

Finally, we reject Vario's argument that the government's amendment applications failed to specify adequate facts relating to the federal offense.

Affirmed.