**UNITED STATES of America, Plaintiff,**

v.

**REAL PROPERTY KNOWN AS 77 EAST 3RD STREET, NEW YORK, NEW YORK, Described as Block 445, Lot 47 in the Records of the Clerk of The County of New York, Defendant-in-rem.**

No. 85 Civ. 3351 (SS).

United States District Court, S.D. New York.

Jan. 4, 1994.

Mary Jo White, U.S. Atty., S.D.N.Y., Asst. U.S. Attys. David E. Sipiora, Aimee Wolfson, New York City, for plaintiff.

Merrill N. Rubin, Easter & Rubin, New York City, for Claimants.

Nina J. Ginsberg, DiMuro, Ginsberg and Lieberman, Alexandria, VA, for Claimant Church of Angels, Inc.

### OPINION AND ORDER

SOTOMAYOR, District Judge.

In this civil forfeiture action, plaintiff, the United States of America (the "Government"), moves for an impanelling of an anonymous jury and for the imposition of certain other measures to secure the jury during the trial process. For the reasons discussed below, the Government's motion is granted.

## BACKGROUND

This case is a civil action brought by the Government pursuant to 21 U.S.C. § 881(a)(7) (1993) to forfeit defendant *in rem*, the building and real property located at 77 East 3rd Street, New York, New York (together the "Building"). The Government maintains that the New York City Chapter of the Hells Angels Motorcycle Club (the "Club") used the Building to store and distribute narcotics.

Sandy Framer Alexander and the Church of Angels, Inc. (the "Church of Angels") claim legal title to the Building and intervene as claimants. Alexander and the Church of Angels claim title to the Building. Colette Alexander, Alexander's wife, also claims a life-tenancy in the property based on a written covenant that is disputed by the Church of Angels. Both Sandy and Colette Alexander were members of the Church of Angels and of the Club. Sandy Alexander was an officer and director of the Club and a trustee of the Church of Angels. Trustees of the Church of Angels have also been officers, directors and members of the Club.

This action was the product of a nationwide undercover investigation of the Club by the federal, state and local authorities from November of 1977 to May 1985. The Government concluded from the investigation that the Club was conducting illegal drug operations through its local chapters, including the New York City Chapter, located at 77 East 3rd Street.

On May 1, 1985, the Government filed a Complaint under 21 U.S.C. § 881(b) against the Building. On the basis of the Government's Complaint, the Clerk of the Court issued a "Warrant for Arrest of Article In Rem" pursuant to Rule C(2) of the Supplemental Rules Concerning Maritime Claims, ordering the seizure of the Building. On the same day, the Government also obtained six (6) separate search warrants for five (5) apartments and the common areas in the building at 77 East 3rd Street and five (5) warrants for the arrest of members and former members of the New York City Chapter of the Club. Indictments against a dozen Club members and trustees of the Church of Angels nationwide, including claimants Sandy and Colette Alexander, were subsequently returned.

On or about June 18, 1985, the parties to this action agreed to a Consent Order, which allowed the record owners of the Building to continue to occupy the premises and remain record owners of the Building pending the outcome of this action. At or about the same time, the Government also filed a Notice of Pendency against the Building with the Clerk of New York County. Thereafter, the Government moved, and ultimately was granted, a stay of this action pending the outcome of the criminal prosecutions of the Club members.

At this time, the criminal prosecutions have resulted in convictions for narcotics-related offenses of almost all of the defendants charged as a result of the Government's investigation. Sandy Alexander, on December 12, 1985, pled guilty to distributing one kilogram or more of cocaine, and to engaging in a "continuing criminal enterprise" in violation of 21 U.S.C. § 848. He received a sentence of 16 years, which was later reduced to 14 years. Sandy Alexander has been released from prison and lives in New York City but not in the Building. Colette Alexander, on June 19, 1986, pled guilty to possessing cocaine and she received a suspended sentence and four years probation for her offense. She currently lives in Florida. Almost all of the convicted defendants have been released from prison and some, after cooperating with the Government, are in witness protection programs.

The Stipulation of Facts dated September 15, 1993 (the "Stipulated Facts"), which have been agreed upon by the parties and which contains a fuller and more complete description of the charges, convictions and sentences of the various Club members arrested as part of the criminal action and of the Club members involvement in the Church of Angels, is incorporated by reference herein.

Recognizing the sensitive nature of this trial which involves the criminal activities of the Club, the parties consented to the use of an extensive juror questionnaire as part of the voir dire process in this action. Claimants, however, have objected to the Govern-

ment's motion to impanel an anonymous jury and to use protective measures during the trial, arguing that an anonymous jury is not warranted in a civil case where a defendant's liberty is not at risk and that the Government's evidence of potential jury harm is based impermissibly on hearsay and speculation. This Opinion and Order memorializes the Court's earlier decision rendered during a conference with the parties which granted the Government's motion.

### DISCUSSION

After review of the affidavits submitted by all parties on the motion before me, I have concluded the following:

■ 1) In this action, the Government is contending that the Building was used to facilitate the conspiracy by the individual claimants Sandy and Colette Alexander and other members of the claimant Church of Angels to manufacture and distribute nationwide "speed" or "crank." At the time some of the claimants' co-conspirators were arrested, rifles, handguns, a uzi machine gun, and ammunition were recovered from the residences in the Building of those co-conspirators. (Stipulated Facts ¶¶ 46, 54). Law enforcement detection and monitoring devices were also seized from the residences in the Building of other Club members. (Stipulated Facts ¶¶ 26, 50). As recently as May 1993, probationary members of the Club were arrested in possession of a fully-loaded assault rifle at a Club function in upstate New York. Declaration of Louis G. Barbaria In Support of Plaintiff's Motion to Impanel an Anonymous Jury with Appropriate Safeguards, dated September 29, 1993 (the "Barbaria Dec."), ¶ 30.

2. Many members of the Club and some members and trustees of the Church of Angels have been implicated in violence against, and intimidation of, witnesses in criminal prosecutions that predated the arrests associated with the instant action. See, e.g., Barbaria Dec. ¶¶ 7–8 (description of the killing of a cooperating government witness in 1978 by a co-conspirator with the individual claimants in their criminal prosecution); Exhibit B to the Declaration of David E. Sipiora, dated September 29, 1993 (the "Sipiora Dec.") (Ex-

hibit B is the Supplemental Affidavit of James J. McGuire, dated September 18, 1987 ("McGuire Aff."), which was submitted in further support of the Government's motion for an anonymous jury in United States of America v. Paul Francis Casey, a/k/a "K.C.," and Brendan Manning, 788 F.Supp. 725 (S.D.N.Y.1991) (the "Manning Case"). The McGuire Aff., ¶¶ 2–13, describes threats and violence resulting in the injury and death of various witnesses and law enforcement officials involved in the prosecution of Club members); Exhibit C to the Sipiora Dec. (Exhibit C is the Affidavit of Richard G. Martinez, dated September 4, 1987 ("Martinez Aff."), submitted in the Manning Case in support of the Government's motion for an anonymous jury, and it describes in ¶¶ 3–5, other incidents of intimidation and violence to witnesses).

3. Threats of violence and intimidation of witnesses, including cooperating witnesses who will testify at this trial, occurred during the criminal prosecution of Club members who were arrested with the individual claimants in this action. See, e.g., Barbaria Dec. ¶¶ 9–12, 14–18 (describing numerous threats to witnesses in the criminal actions).

4. Jurors in some of the criminal prosecutions of Club members were followed to their cars; a Club member approached one juror's child to convey a threat; and the presence of large numbers of Club members at Club trials intimidated other jurors. See, e.g., Barbaria Dec. ¶ 13; McGuire Aff. ¶ 12; Martinez Aff. 5. Counsel to the Church of Angels during a recent telephone conference with the Court has indicated that a large number of Club members will assist him in the courtroom while some Government witnesses are testifying.

5. The threat of violence to witnesses by Club members has resulted in the impanelling of anonymous juries both in the Manning Case and in United States v. Pasciuti, 803 F.Supp. 499, 502 (D.N.H.1992).

6. In light of the extensive publicity given to the Manning Case and the continuing public interest in this suit and in the business of the Club during this past year, it is likely that this action will continue to generate

media attention. (*See* Sipiora Dec. ¶ 5). In fact, this week a journalist contacted not only the parties' attorneys but also a key witness to gather information about the case.

7. The Building is the clubhouse for the New York Chapter of the Club and, as admitted by the Chapter's President in a newspaper article, this action has left the Club "financially pressed". (Exhibit F to the Sipiora Dec.). The heightened precautions the claimants allege were taken to safeguard the Building from possible forfeiture underscores the importance of this dwelling to the Club.

Based on the foregoing, I conclude that "there is strong reason to believe the jury needs protection". *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991). The history of violence perpetrated by members and associates of the Church of Angels demonstrates that they "possess the means to harm the jurors," *United States v. Thomas,* 757 F.2d 1359, 1365 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985), and the serious consequences of this action to the Church of Angels may provide them ample motive to do so. The prior efforts of some members and associates of the Church of Angels to obstruct the judicial process and the extensive publicity this case is likely to receive further demonstrate the need for an anonymous jury in this case. *United States v. Persico,* 832 F.2d 705, 717 (2d Cir.1987) (impanelling of anonymous jury warranted where Government alleged a history of violence and a willingness to corrupt and obstruct the judicial process, and case was likely to attract extensive publicity), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Vario,* 943 F.2d 236, 240 (2d Cir.1991) (impanelling anonymous jury warranted where defendants were charged with grand jury tampering and

the trial was expected to attract publicity), *cert. denied,* —— U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *United States v. Tutino,* 883 F.2d 1125, 1133 (2d Cir.1989) (impanelling anonymous jury justified where the defendant had history of jury tampering and a serious criminal record), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).[1]

■ While I have not found a reported decision in this district ordering that an anonymous jury be impanelled in a civil case, I do not believe that the governing standards should be any different from those applied in the criminal context. The gravity of the consequences to individuals affected and their potential for retaliatory violence, rather than the nature of the action, should control the inquiry. *Cf. Paccione,* 949 F.2d at 1192–93 (anonymous juries appropriate where defendants charged with "serious crimes" with "potential for long prison terms"); *United States v. Gambino,* 809 F.Supp. 1061, 1065 (S.D.N.Y.1992) (in determining whether there was a strong reason to impanel anonymous jury courts have considered, *inter alia,* the seriousness of the offenses charged and the defendants' ability to harm jurors). Property rights are constitutionally protected interests, *cf. United States v. James Daniel Good Real Property et al.,* —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (Due Process Clause of the Fifth Amendment requires Government give owners of real property notice and an opportunity to be heard before seizing property pursuant to 21 U.S.C. § 881(a)), and the loss of these rights, like a long prison term, may have a grave impact on those affected. Here, the importance of the Building not only to the Church of Angels but also to the individual claimants is clear. The Building was the home of the

---

1. The claimants' argument that the evidence presented by the Government is either too unreliable or attenuated to justify impanelling an anonymous jury is without merit. Although the supporting affidavit of Senior Investigator Louis G. Barbaria is based in part on hearsay, the arrests of many Club members for acts of violence are uncontroverted. Claimant Sandy Alexander personally has pled guilty under the "drug kingpin" statute, 21 U.S.C. § 848. Other Hells Angels club members have pled guilty to or been convicted of the possession of illegal firearms. This evidence alone sufficiently establishes a strong need for juror protection. The Government need not show that actual violence or threat of violence has occurred in the extant case before an anonymous jury may be impanelled. The Government need only prove a serious risk of harm to the jury, *see, e.g., United States v. Barnes,* 604 F.2d 121, 141 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Shakur,* 623 F.Supp. 1 (S.D.N.Y. 1983), which it has done here.

individual claimants, Sandy and Colette Alexander, and still serves as the meeting place for Club members. Given the grave impact loss of the Building would have on Club members, and the history of violence committed by them, I believe that the risk posed is sufficient to warrant the use of an anonymous jury.

I have taken reasonable precautions to minimize any prejudicial effect posed to the claimants by use of an anonymous jury and other protective measures. I will work with the parties in fashioning an instruction to the jury during voir dire concerning these procedures, and the extensive questionnaire I have devised for the jurors as well as my individual questioning of them will ensure that the claimants' fundamental rights are protected. *Cf. Paccione,* 949 F.2d at 1192 (court should not order the impanelling of an anonymous jury without, *inter alia,* "taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected").

 Finally, claimants, concerned that publication of the Government's anonymous jury motion and the opinion of the court granting such motion might prejudice potential jurors against the them, have asked that I seal the record on this motion. However, I recently have been advised that at least one major newspaper has already had access to and is in possession of the motion papers. Thus, the motion to seal is moot. I will, however, question prospective jurors about any publicity that may have occurred by the time they appear for jury selection.

### CONCLUSION

For the reasons discussed, I order the impanelling of an anonymous jury and order, as requested by the Government, that (1) the jurors be kept together during the trial day and during lunch under the supervision of a United States Marshall and that (2) the United States Marshall's office escort the jury to and from the courthouse in a group and collect and disperse them from a central location away from the courthouse. The transport service to be used should be Secu-

rity Leasing of 1084 Bay Street, Staten Island, New York 10305.

**SO ORDERED.**