**UNITED STATES of America,**
**Appellee,**

v.

**Charles CARNEGLIA and Salvatore Scala, Defendants–Appellants.**

**Nos. 01–1585(L), 01–1656.**

United States Court of Appeals,
Second Circuit.

Sept. 19, 2002.

Robert L. Moore, Fine & Bassik, Great Neck, NY, for Defendant Appellant Charles Carneglia.

Roland R. Acevedo, Seiff Kretz & Maffeo, New York, NY, for Defendant–Appellant Salvatore Scala.

Andrew M. Genser, Assistant United States Attorney (David C. James, Assistant United States Attorney, of counsel, Alan Vinegrad, United States Attorney, on the brief), United States Attorney's Office for the Eastern District of New York, Brooklyn, NY, for Appellee.

Present McLAUGHLIN, CABRANES Circuit Judges, and LYNCH, District Judge.*

### SUMMARY ORDER

**UPON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court be and it hereby is **AFFIRMED.**

Charles Carneglia and Salvatore Scala appeal from judgments of conviction entered on November 2, 2001 in the United States District Court for the Eastern District of New York (Jacob Mishler, *Judge* ). The defendants were charged with racketeering and racketeering conspiracy based upon the predicate acts of extorting two adult entertainment businesses known as Cherry's Video and The Forbidden Fruit. The defendants were also charged with extortion, attempted extortion, two counts of conspiracy to extort, and loansharking conspiracy. On May 22, 2000, after a five week trial, the defendants were both convicted of conspiring to extort Cherry's Video and were acquitted on all other counts. The defendants were each sentenced to 63 months imprisonment, and they timely appealed their convictions and sentences. For the following reasons, we affirm.

### BACKGROUND

Charles Carneglia and Salvatore Scala are members of the Gambino crime family. After being surveilled by the FBI for a number of months, they were arrested along with numerous co-defendants for, *inter alia,* racketeering and conspiring to extort Cherry's Video, an adult video store on Long Island. To establish that Cherry Video was extorted in 1999 and 2000 by

---

\* The Honorable Gerard E. Lynch of the United States District Court for the Southern District of New York, sitting by designation.

one of the defendants' co-conspirators, Carl Kline, the government introduced direct testimony of Danny Melendez, the owner of Cherry Video, as well as recordings of numerous conversations between Malendez and Kline.[1] In order to prove Scala and Carneglia's involvement in the extortion, the government introduced more than 70 recorded conversations among the various co-conspirators. Because the recordings contained code names and were generally vague in identifying relevant people and places (often using pronouns instead of proper nouns), the government qualified the investigating FBI agent, Gregory Hagarty, as an expert so that he could interpret the tapes for the jury.

Based upon a reasonable interpretation of these recordings, Kline admitted he worked under Carneglia, who was a "made member" of the Gambino crime family, and that he shared the extorted money with Carneglia. The tapes reasonably indicate that the extortion involved two separate transactions: (1) the weekly extortion of $300 from Melendez, which Carneglia was responsible for overseeing, and (2) the attempt to obtain 15% of Cherry Video from Melendez (valued at $7500), for which Scala was ultimately responsible. The recorded conversations reveal that a dispute arose between Kline and a member of the Bonanno crime family, Tommy DiFiore, over which "family" had the right to extort Melendez. Carneglia asked Scala for assistance, and the two had a "sit-down" with DiFiore on May 3, 2000. The government asked the jury to infer Scala's participation in the extortion from the assistance he provided to Carneglia and from his role in the sit-down, as reflected in subsequent recordings.

Before the trial, the government moved to empanel an anonymous jury, claiming that anonymity was necessary "because of the defendants' association with organized crime, and because of evidence that defendants Salvatore Scala and Charles Carneglia have previously participated in murder and jury tampering." Specifically, the government proffered that both defendants are longtime members of the Gambino crime family and that a government informant, Sammy Gravano, testified during another criminal trial that Scala and Carneglia each participated in various murders and that Scala had been involved in a plot to bribe a juror. Over Carneglia's objection, the District Court granted the motion, finding that "there is a strong reason to believe the jury needs protection." The court also denied Carnelglia's alternative request for severance, finding that it would take adequate precautions during voir dire to minimize the prejudicial effects of an anonymous jury.

At trial, the government also offered the following evidence of the defendants' association with organized crime: (1) The "Ravenite Video"—a compilation of surveillance videos taken between 1988 and 1990 that showed Scala and Carneglia associating with members of the Gambino crime family; (2) the testimony of Steven Bisulca, a cooperating witness and member of the Luchese crime family, stating that a member of the Gambino crime family told him that Scala was a captain in their organization; and (3) recordings made in 1998 of conversations between John Carneglia, Charles Carneglia's brother, and another member of the Gambino crime family in which (according to the Government's interpretation of the conversation, which the jury was free to accept) John Carneglia referred to Scala as a Gambino family captain.

---

1. Melendez contacted the FBI following Kline's initial extortion request, and cooperated with the FBI from that point on, frequently wearing "wires" when he and Kline met.

The defendants objected to the admission of each of these items of evidence, arguing that they were more prejudicial than probative and that Bisulca's testimony was inadmissible hearsay.

The District Court admitted all three, concluding that they were not unduly prejudicial and that Bisulca's testimony was excepted from the hearsay rule under Fed. R.Evid. 801(d)(2)(E) as a statement of a co-conspirator made in furtherance of a conspiracy because it was made in the course of a dispute regarding the respective roles of the two conversants and their "families" in the extortion of the garbage-carting industry.

## DISCUSSION

### A. The Anonymous Jury

In order to empanel an anonymous jury, "there must be, first, strong reason to believe that the jury needs protection and, second, reasonable precaution must be taken to minimize the effect that such a decision might have on the jurors' opinions of the defendants." *United States v. Thomas*, 757 F.2d 1359, 1365 (2d Cir.1985). "If there is evidence to support the district court's finding of reason to believe the jury needs protection, and if the court has taken reasonable precautions to minimize any prejudicial effects on the defendant and to ensure protection of his fundamental rights, the decision to empanel an anonymous jury is reviewed only for abuse of discretion." *United States v. Thai*, 29 F.3d 785, 801 (2d Cir.1994).[2]

The defendants argue that, because Gravano's testimony regarding the prior murders and Scala's prior jury tampering is unsupported and because the defendants were never charged with these crimes, Gravano's statements did not provide a "strong reason" to believe the jury needed protection. They rely upon *United States v. Vario*, 943 F.2d 236, 241 (2d Cir.1991), for the proposition that affiliation with organized crime, standing alone, is insufficient to warrant an anonymous jury. We held in *Vario* that

> [b]efore a district judge may rely on the organized crime connection of a defendant as a factor in the question of anonymous juries, he must make a determination that this connection has some direct relevance to the question of juror fears or safety in the trial at hand, beyond the innuendo that this connection conjures up.

*Id.*

■ It is clear that, with regard to defendant Scala, Gravano's prior testimony that Scala has been involved in jury tampering creates a sufficiently strong reason to empanel an anonymous jury. In *Vario* we ultimately affirmed the district court's decision to empanel an anonymous jury because it was based in part upon the fact that the defendant had previously faced obstruction of justice charges. *Id.* at 240–41. Although Scala was never charged with obstruction of justice, in light of Gravano's statement under oath that Scala has previously tampered with jurors, the District Court did not abuse its discretion in determining that Scala's connection to the Gambino crime family has "some direct relevance to the question of juror fears." *Id.* at 240. Because the District Court took reasonable precautions to minimize

---

**2.** Although Scala alleges that he filed a motion to re-argue the court's decision to empanel an anonymous jury on April 18, 2001, fourteen days after the court's granted the motion, he never objected to the empaneling of an anonymous jury before the court's decision and, therefore, he must show that this decision constituted plain error. *United States v. Aulicino*, 44 F.3d 1102, 1109 (2d Cir.1995). Carnelglia, however, did timely object to the government's motion for an anonymous jury.

the effects of an anonymous jury by inviting defense counsel to provide suggestions for the substance and procedure of voir dire and any other information that it wished to convey to the jury in order to minimize the effects of anonymity, it did not err in allowing Scala's jury to remain anonymous.

■ In addition, the District Court did not abuse its discretion by denying Carneglia's severance motion once it determined that there was a strong reason for Scala's jury to remain anonymous. Even if Carneglia's participation in the extortion and Gravano's allegations that Carneglia has murdered in the past would be insufficient to justify empaneling an anonymous jury to decide the charges against him if he were on trial alone, we have held that, where one co-defendant warrants an anonymous jury, the other co-defendant's due process rights are not violated by a refusal to sever:

> In light of our conclusion that the use of an anonymous jury was based on sufficient evidence of potential jury tampering by Aulicino's co-conspirators . . . , we conclude that Aulicino's due process rights were not violated even in the absence of evidence that he in particular had sought to obstruct justice. Further, the fact that Aulicino was acquitted on six of the seven counts in which he was charged belies his conclusory assertion that the joint trial before an anonymous jury caused him prejudice.

*United States v. Aulicino,* 44 F.3d 1102, 1117 (2d Cir.1995). Like Aulicino, Carneglia was acquitted on all but one of the counts against him, demonstrating that the jury's anonymity did not unfairly prejudice it against him.

B. *The Expert Testimony*

■ During the trial, Agent Hagarty repeatedly gave his opinion regarding the meaning of various statements and references. Sometimes, these interpretations fell squarely within the province of his expertise—for example, his testimony regarding the meaning of code names used on the recordings. At other points, however, Agent Hagarty's testimony was not as clearly within the realm of his expertise. Specifically, he frequently testified about the intended references of certain pronouns and general terms. For example, when an individual on one of the recordings said "I got two different issues from two different guys," the Court permitted Agent Hagarty to state his opinion that the "two guys" were Scala and Carneglia and the "two issues" were the two different parts of the Cherry Video extortion. The defendants argue that, because Agent Hagarty's opinion as to the meaning of these references was not based upon an interpretation of Mafia code language, the District Court should not have permitted him to testify about their intended meaning.

Rule 702 of the Federal Rules of Evidence provides that "If . . . specialized knowledge will assist the trier of fact to understand the evidence . . . a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise. . . ." An expert's opinion must be more than "subjective belief or unsupported speculation," but need not reach the level of "known to a certainty" to be admissible. *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 affords "broad discretion to a district court to admit expert testimony," and such a decision "should not be set aside unless manifestly erroneous." *United States v. Feliciano,* 223 F.3d 102, 120 (2d Cir.2000) (internal citation and quotation marks omitted).

We have consistently upheld the use of expert testimony "to explain the operation, structure, membership, and terminology of organized crime." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir.1993). *See also United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.1988). We have also permitted an agent to "g[i]ve testimony concerning the meaning of certain ... recorded conversations" even where the testimony included "conclusions and interpretations" of the recorded conversations, as long as the agent did not attempt to draw conclusions "in terms of the applicable legal criteria." *United States v. Ruggiero*, 928 F.2d 1289, 1304–05 (2d Cir.1991).[3] Accordingly, the District Court's decision to permit Agent Hagarty's interpretations was not out of line with our precedent.

Further, the trial court gave the following cautionary instruction to the jury: "The mere fact that I found [Hagarty] qualified to express an opinion doesn't mean that the jury must accept it.... [O]nce he expressed an opinion, it's for the jury to weigh the quality and credibility of that opinion." As this instruction made clear, the jury was free to recognize the limits of Agent Hagarty's expertise and chose not to accept some of his interpretations and conclusions. In light of our holding in *Ruggiero* and the Court's instruction to the jury regarding expert testimony, the District Court did not manifestly err by allowing Agent Hagarty to interpret the vague terms and references on the recordings. *United States v. Feliciano*, 223 F.3d 102, 120 (2d Cir.2000).[4]

## C. Due Process Claims

The defendants maintain that the District Court made numerous errors in addition to the improper empaneling of an anonymous jury and the improper admission of Agent Hagarty's interpretive testimony. They argue that, even if, standing alone, none of these errors are prejudicial, their cumulative effect was to deny the defendants a fair trial.

### 1. The Government's Summation

■ On appeal, the defendants object to the following statement made by the prosecutor during his summation: "The Mafia controls the porno business in Suffolk County. If you run a topless club or adult video store, one way or the other you are going to have to pay the Mafia for protection. If you don't you will face the fact that the Mafia will wreck the place, hurt your employees or worse." Because the defendants failed to contemporaneously object to this statement at trial, we review these remarks for plain error, and we will reverse "solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 14–15, 105 S.Ct. 1038, 84 L.Ed.2d 1

**3.** The defendants argue that, because Agent Hagarty repeatedly used the term "extortion" in his interpretations, he was impermissibly drawing legal conclusions. However, the term "extortion" has practical as well as legal significance. Further, Agent Hagarty's testimony was not introduced for the purpose of establishing that Melendez was extorted—a fact which both of the defendants conceded; it was simply intended to demonstrate that *the defendants* were involved in the extortion. Accordingly, Agent Hagarty's use of the term extortion did not impermissibly draw a legal conclusion.

**4.** Even if we found that Agent Hagarty's interpretation of some of the references should not have been permitted, "an error with respect to admission of evidence will [only] result in reversal of a conviction if it had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Castillo*, 924 F.2d 1227, 1233 (2d Cir.1991) (internal citations and quotation marks omitted). Because the recordings themselves provided enough evidence to support the conviction, any improperly admitted expert testimony could not have had a "substantial and injurious effect" upon the verdict.

(1985) (internal citation and quotation marks omitted). Based upon an examination of the record, it is apparent that these remarks fairly and accurately describe the evidence adduced at trial. For, the recordings show that Kline repeatedly made clear to Melendez that (1) every adult establishment had to be "with" a crime family and (2) Melendez would not be safe if he failed to pay. Accordingly, the District Court did not err, much less plainly err, in allowing the prosecutor to make these statements during closing argument.

## 2. The Evidentiary Rulings

■ The defendants also argue that the District Court erred in admitting the Ravenite Video, Bisulca's testimony, and the recordings of John Carneglia for the purpose of demonstrating their association with organized crime. Because the government needed to prove the defendants' association with organized crime in order to establish the elements of the racketeering charges, however, it obvious that these three items of evidence were more probative than prejudicial. Further, the District Court did not err in finding that Bisulca's testimony met the hearsay exception set forth in Fed.R.Evid. 801(d)(2)(E) because the government proffered sufficient evidence to demonstrate that Bisulca and the Gambino crime family member with whom he was conversing were arguing over their respective roles in a conspiracy among numerous crime families to extort the garbage-carting industry on Long Island. *See United States v. Russo*, 302 F.3d 37 (2d Cir.2002) (holding that, although membership in organized crime alone does not constitute a conspiracy sufficient to meet the exception to the hearsay rule set forth in 801(d)(2)(E), the exception applies if the statement was made in furtherance of a particular criminal conspiracy among organized crime members).

Because none of the challenged District Court ruling were erroneous, the defendants were not deprived of their right to a fair trial.

## D. Sufficiency of the Evidence

■ The defendants argue that the evidence must have been insufficient to support their convictions because the verdict was inconsistent. Specifically, they claim that the conspiracy to extort charge, of which they were convicted, required proof of essentially the same elements as the racketeering conspiracy charge, of which they were acquitted. This is not accurate: It is entirely possible that the jury believed the defendants were guilty of conspiring to extort Cherry's Video, but found reasonable doubt as to whether the conspiracy constituted a predicate act in a pattern of racketeering. Further, even if the verdicts were inconsistent, the Supreme Court has made clear that a defendant may not attack the sufficiency of the evidence on the basis of an inconsistent verdict. *See Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

■ The defendants also argue more generally that the properly admitted evidence was insufficient to support their convictions. Sufficient evidence exists to support a conviction if "viewing the evidence in the light most favorable to the prosecution, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Samaria,* 239 F.3d 228, 233 (2d Cir.2001) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Notably, the defendants only seem to argue that the evidence is insufficient *if we disregard Agent Hagarty's opinion testimony.* Our case law makes clear that, where certain evidence was im-

properly admitted by the district court, we must nevertheless consider that evidence in determining whether the evidence adduced at trial was sufficient to support the verdict. *United States v. Freidin*, 849 F.2d 716, 723 (2d Cir.1988). Therefore, even if we found that Agent Hagarty's testimony was improperly admitted, we would still have to consider it in making a sufficiency determination. Because the defendants do not argue that the evidence presented to the jury, in its entirety, is insufficient to support their convictions, and because the record, examined as a whole, clearly reflects sufficient evidence to support the convictions, the defendants' sufficiency arguments necessarily fail.

### E. Sentencing

Finally, Scala and Carneglia argue that the District Court erred in calculating their sentencing ranges. They claim that the Court erred in (1) adding two points to their base offense levels pursuant to U.S.S.G. § 3B1.1(c) for their managerial roles in the conspiracy and (2) adding one point to their base offense levels pursuant to U.S.S.G. § 2B3.1(b)(7)(B) because it found that the total amount demanded of the victim was greater that $10,000.[5]

Sentencing factors need only be established by a preponderance of the evidence, *see, e.g., United States v. Reese*, 33 F.3d 166, 174 (2d Cir.1994), and we review the sentencing court's determination of factual issues for clear error, *see, e.g., United States v. Germosen*, 139 F.3d 120, 129 (2d Cir.1998).

■ Scala argues that the court erred in concluding that he played a managerial role in the extortion conspiracy because "the facts show that (i) Mr. Scala initially knew nothing about the conspiracy and (ii) once he learned about it he indicated that he did not want to be involved." Carneglia advances a similar argument, claiming that his role was "limited to that of a cheerleader" and that he was not even aware of the extortion until late April. These arguments are flawed because they rely upon a view of the evidence in the light most favorable to the (now convicted) defendants. Because the evidence adduced at trial showed that Scala was the highest ranking member of the Gambino crime family directly involved in the conspiracy, the District Court did not clearly err in finding by a preponderance of the evidence that Scala exercised some degree of control over the other participants. Similarly, it is clear from numerous recordings that Carneglia supervised Kline and McMahon and, therefore, the District Court did not clearly err in finding that Carneglia had a supervisory role in the extortion.[6]

■ Both defendants argue that, because there is no evidence in the record showing that they participated in, or were even aware, of the scheme to extort 15% of Cherry's Video, the total amount they demanded of the victim was only $3,800. Once again the defendants improperly ask us to view the evidence in the light most favorable to themselves. Based upon the frequent conversations between other co-

---

5. The weekly payments extorted from Melendez totaled $3,800, and the 15% of Cherry Video that they attempted to extort was valued at $7,500.

6. Carneglia also argues that, in allocating an additional three points to his base offense level for his supervisory role in the conspiracy, the District Court relied upon a typographical error in the Pre Sentence Investiga-

tion Report, and that, pursuant to U.S.S.G. § 3B1.1(c), only two levels should have been added. It is clear from the record, however, that the three point increase was based upon the District Court's express and well-supported finding that the criminal activity involved five or more participants. *See* U.S.S.G. § 3B1.1(b).

conspirators about the scheme to extort 15% of Cherry's Video and Scala and Carneglia's own references to the various "parts" of the extortion, the District Court did not err in finding by a preponderance of the evidence that the defendants were involved in this aspect of the conspiracy.

### CONCLUSION

For the reasons set forth above, and because the defendants' remaining arguments are without merit, the judgments of conviction and sentences are affirmed.