**10-5026-cr**
**United States v. Antico**

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2011

(Argued:  December 13, 2011          Decided: August 14, 2012)

Docket No. 10-5026-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

             Appellee,

v.

ANTHONY PICA, BEVERLY PRINCE,
CHARLES SANTIAGO, SALVATORE
MANISCALCO, JR., JOHN DELUTRO, aka
Whiz,

             Defendants,

ANTHONY ANTICO,

             Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: POOLER, LIVINGSTON, and LOHIER, <u>Circuit</u> <u>Judges</u>.

        Anthony Antico appeals from a judgment of conviction entered in the United States
District Court for the Eastern District of New York (Amon, <u>C.J.</u>) after an anonymous jury found
him guilty of one count of participating in a racketeering enterprise and one count of illegal
gambling.  Antico was sentenced principally to a term of 108 months' imprisonment.  On appeal,

Antico challenges the sufficiency of the evidence supporting his conviction for racketeering, the District Court's decision to empanel an anonymous jury, and the procedural and substantive reasonableness of his sentence. We affirm.

Judge Pooler concurs in part and dissents in part by separate opinion.

DIARMUID WHITE, White & White (Brendan White, White & White, Gerald J. McMahon, on the briefs), New York, NY, for Defendant-Appellant.

STEPHEN E. FRANK, Assistant United States Attorney (Peter A. Norling, Nicole M. Argentieri, Jack Dennehy, Assistant United States Attorneys, of counsel), for Loretta E. Lynch, United States Attorney, Eastern District of New York, Brooklyn, NY, for Appellee.

LOHIER, Circuit Judge:

Anthony Antico appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Eastern District of New York (Amon, C.J.), at which he was found guilty of one count of participating in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c), and one count of illegal gambling, in violation of 18 U.S.C. § 1955. On appeal, Antico challenges the District Court's decision to empanel an anonymous jury at trial, the sufficiency of the evidence underlying the racketeering conviction, and his sentence of 108 months' imprisonment on that count. We affirm.

## BACKGROUND

Antico argues that there was insufficient evidence that he agreed in 2008 to extort money from or rob Mario Gulinello, who had won $1.6 million on a "Pick Six" horse racing bet. Antico's participation in the conspiracy to rob Gulinello constituted one of the relevant predicate acts in the racketeering charge of which Antico was convicted. Because this is an appeal from a judgment of conviction entered after a jury trial, the following facts are drawn from the trial

2

evidence and described in the light most favorable to the Government. United States v. Bahel, 662 F.3d 610, 617 (2d Cir. 2011). We limit our recitation of the facts to those relevant to Antico's sufficiency challenge.

Gulinello, the target of Antico's robbery conspiracy, became a millionaire in 2004. By 2008, one of Gulinello's acquaintances, Ralph Lento, had introduced him to Joseph Barrafato, Jr., a ranking member of the Genovese crime family. In June 2008, Lento and Barrafato – a self-described "made guy" involved in organized crime – met Gulinello at an off-track betting parlor ("OTB") in the Bay Ridge section of Brooklyn. Barrafato asked Gulinello to join them for coffee at a coffee shop a short drive away. With Gulinello in the back seat of their car, Lento and Barrafato instead drove past the coffee shop to the Coney Island section of Brooklyn. After reaching a particular Coney Island street, they slowed down and another car pulled up beside them. At that point, Barrafato called out to the driver in the other car, "Hey, Tico, say hello to my friend Mario." Gulinello's encounter with Antico, whose various aliases include "Tico" and "Big Nose," lasted a few seconds. At trial Gulinello testified that Barrafato had previously described Antico as a "good guy" recently released from jail. After the encounter, Gulinello stopped frequenting the OTB parlor and returning Barrafato's telephone calls.

At or around the same time in 2008, Barrafato's telephone conversations were intercepted by government agents via a court-authorized wiretap. In excerpts of several calls from late June 2008 through July 2008 that were played for the jury, Barrafato and Antico revealed their increasing financial difficulties, their familiarity with Gulinello's wealth, and their eagerness to rob Gulinello with the help of accomplices.

3

On June 28, 2008, for example, in a telephone conversation recorded by the Government, Barrafato and Lento discussed their financial worries, and Barrafato told Lento that "Big Nose" had assured him that they would "have . . . money soon again." On July 9, 2008, Antico urged Barrafato to proceed quickly with a robbery that they had previously discussed, and Barrafato specifically referred to a "house rob[bery]":

ANTICO:      . . . You gotta start movin' around, my friend. . . .

             . . .

BARRAFATO:   I'm tryin' to put a few things together, you know? . . .

             . . .

             [W]hat are you, in OTB?

ANTICO:      Nah, I'm home. . . .

             . . .

             Get that . . . guy[] to hang out with us!

BARRAFATO:   [W]hich guy . . . the one I told you about, with that thing?

ANTICO:      Yeah, yeah. Ya gotta hang out with him.

BARRAFATO:   . . . I gotta go a different route with him. . . . Listen to me, it's gotta be done the way I told you . . . .

ANTICO:      Yeah, right.

BARRAFATO:   Yeah. It's the only way!

             . . .

             Yeah, because these guys . . . , they would look to house rob him. . . .

             . . .

             Yeah, yeah. I told them, "You, you don't go near there," I told them.

ANTICO:      That's it.

4

BARRAFATO: . . . I said, "Back away from it," I told them. "If there's anythin', I'm comin' to you," I told them.

Appellant's Appendix ("App.") 59-60.

Two days later, on July 11, 2008, Barrafato and Antico spoke urgently again about that "thing over there":

BARRAFATO: We're gonna come put . . . Yeah, I gotta . . . We're puttin' somethin' together with that . . . thing over there.

ANTICO: Oh! Alright.

BARRAFATO: Yeah. It's gonna be . . . We gotta do it. I, I can't wait no more.

ANTICO: I know. Can't . . .

BARRAFATO: No.

ANTICO: . . . wait for it.

BARRAFATO: No, I can't wait. No, I need, just I need the right ingredients to make the sauce, you know?

ANTICO: Right.

BARRAFATO: Yeah. That's the whole thing, it's the right ingredients. I'm hurtin' myself right now. You know what I'm sayin'? Yeah, exactly.

ANTICO: Alright.

App. 38-39.

On the evening of July 12, 2008, Barrafato discussed the proposed robbery in a series of telephone conversations with Antico, Lento, and Frank Martino, another associate of the Genovese crime family. During the first call, at 8:09 p.m., Barrafato spoke with Martino about the possibility of recruiting "Paulie" for the robbery of a "Pick 6" winner. Barrafato described the Pick 6 winner as a "millionaire" with whom "Paulie" was acquainted:

5

BARRAFATO: [Y]ou know a kid Paulie with a skin head? He's got a bald head?

MARTINO: Paulie? Yeah.

BARRAFATO: OK. Uh . . . there's somethin' uh . . . We gotta get . . . I, when, when I see you, I'll talk to you.

MARTINO: OK.

BARRAFATO: Yeah. We . . . And uh, this, this thing here could go down . . . 'Cause I rather talk to you in person, you know?

. . .

[H]e could help us with somethin' where we could uh . . .

MARTINO: Oh, yeah?

. . .

BARRAFATO: Yeah, yeah. Well . . . And he stays with a guy that's a millionaire. Do you understand? And uh . . . But we can't let him know. Capisce?

MARTINO: Right.

BARRAFATO: You just gotta, 'cause you just gotta get him to, to us.

MARTINO: He's, he's always got, he's always got those type of guys hangin' around him, all the time. . . .

BARRAFATO: Ye- Yeah, the guy . . .

MARTINO: Huh?

BARRAFATO: This is the guy that hit the Pick 6 for a million point six. He hit the Pick 6 . . .

MARTINO: He did?

BARRAFATO: . . . yeah, a cou-, a few years back.

App. 42-44. Antico does not suggest that "the guy that hit the Pick 6" refers to anyone but

Gulinello.

6

After explaining that Paulie could be enlisted to help rob Gulinello, Barrafato told Martino that he personally knew the target of the robbery:

MARTINO: [S]o what could this kid [Paulie] do for you?

BARRAFATO: Well, I, I said I'll tell you when I see you how we gotta go for, for us. You know what I'm sayin'? Wi-with this. Where we could put maybe 20 in our pockets.

. . .

I got the, listen, I got the guy. I know where the guy lives. I got, I got everythin' on him. But I sayin, uh . . .

MARTINO: Right.

BARRAFATO: [H]e knows, you know, he knows me, you know?

App. 44-45.

Barrafato spoke with Antico at 9:02 p.m. on July 12, 2008, less than an hour after speaking with Martino about robbing Gulinello:

BARRAFATO: Oh, I've been, been runnin' around tryin' to put things together, you know?

ANTICO: And you got it together?

BARRAFATO: We're gonna, we're gonna do, we're gonna, uh, do it this week.

ANTICO: With those, with those guys?

BARRAFATO: With . . . No, no. Somebody else. Me and somebody else.

ANTICO: Are you gonna . . . ? They're gonna do it? They're gonna do it . . .?

BARRAFATO: I, I, I wanna go, I wanna go over it with you be-, you know, before.

ANTICO: Alright.

. . .

7

BARRAFATO: I'll talk to you uh, maybe uh, Monday or, you know . . . ?

ANTICO: You, you got it.

App. 65.

Four minutes later, at 9:06 p.m., Barrafato called Lento, who previously had helped Barrafato drive Gulinello to Coney Island to meet Antico. Barrafato urged Lento to make himself "available" that week for "somethin', somethin' good." Barrafato explained that he had spoken to Frankie Martino and that the participants would consist of "me, you, him [Martino] and we need one more guy, that's all. But a good guy." Barrafato informed Lento that he also had spoken to Antico about his plans: "And I, I just spoke to Big Nose and uh . . . I guess, he's gonna talk to Frankie [Martino] before, but you are down on it . . . . You and somebody else." Addressing their financial woes, Barrafato added, "We're now . . . at least we'll get ourselves above water." App. 49-50.

Three days later, on July 15, 2008, Barrafato told Antico that he had done his "homework" and "leg work" to prepare, and that he had "been over" and would be able to do "it" during "the weekend":

BARRAFATO: . . . I want you to – I told you to take care of that thing, that thing. You know.

ANTICO: Yeah?

BARRAFATO: What I was tellin' you? Yeah, we did a lit- . . . we did a little leg work.

ANTICO: Huh?

BARRAFATO: We did some leg work on it, you know?

ANTICO: Yeah, uh-huh.

BARRAFATO: Yeah, yeah. We've been over . . . . We're gonna it do [sic] uh . . . the weekend.

8

ANTICO: Oh, yeah?

BARRAFATO: Yeah. We did the leg work, you know? . . .

ANTICO: Yeah, yeah.

BARRAFATO: Yeah, you gotta, you gotta do your homework.

ANTICO: All right.

App. 53.

Barrafato and Antico spoke again by telephone the following afternoon, on July 16, 2008.

During the same conversation, Antico specifically mentioned a plan to "rob somebody," while

Barrafato suggested that they speak in person rather than by phone after he had "everything

prepared":

BARRAFATO: What's doin', buddy?

ANTICO: You're gonna rob anybody or just, you, you
know . . . ? Hello?

BARRAFATO: Yeah, yeah, yeah.

ANTICO: Yeah. What happened?

BARRAFATO: All right. Uh . . . I'm gonna go out and do a
couple things . . .

. . .

Yeah, and uh . . . We'll, we'll get everything
prepared and uh, then, uh, I wanna touch base
with you. Like, you know . . .

ANTICO: Go ahead.

BARRAFATO: . . . I would like to see you in person, you
know?

ANTICO: Go ahead. Don't worry . . .

BARRAFATO: I wanna, I wanna tell you . . . Yeah.

ANTICO: . . . too much.

9

App. 56. Barrafato and Antico are heard laughing after Antico said, "You gonna rob anybody."
The following day, July 17, 2008, a federal law enforcement agent visited Barrafato at home, and the conspiracy to rob Gulinello ended.

2. Procedural History

Antico was charged in a five-count superseding indictment (the "Indictment"). Count One, which is most relevant to this appeal, charged him with conducting or participating in the conduct of a racketeering enterprise in violation of 18 U.S.C. § 1962(c), based on four predicate acts, any two of which would support a conviction of racketeering conspiracy. Two of the predicate acts were (1) a conspiracy to extort money from Gulinello, in violation of New York Penal Law §§ 155.40(2) and 105.10, or to rob Gulinello, in violation of New York Penal Law §§ 160.10(1) and 105.10, and (2) illegal gambling, in violation of 18 U.S.C. § 1955. The remaining counts charged Antico with illegal gambling, robbery conspiracy, attempted robbery, and using and carrying a firearm in furtherance of a crime of violence.

At trial, the District Court empaneled an anonymous jury.[1] Before doing so, the court noted Antico's prior federal conviction in the United States District Court for the Eastern District of New York for "racketeering with predicate acts of extortion and witness tampering." The District Court also considered "the seriousness of the charges, the lengthy prison sentences that convictions would entail, the evidence of Antico's efforts to interfere with the judicial process, and the ability of the defendant to enlist the resources of the Genovese crime family."

---

[1] The District Court employed a modified voir dire in which prospective jurors completed a detailed questionnaire, but their names, addresses, and workplaces were not disclosed to Antico.

Antico was convicted of Count One based on (1) his participation in a conspiracy to extort money from or rob Gulinello, and (2) illegal gambling. The jury also convicted Antico of a separate count of illegal gambling but acquitted him of the remaining counts against him. In November 2010 the District Court sentenced Antico principally to 108 months' imprisonment on the racketeering conviction.[2] In imposing sentence, the District Court relied in part on testimony from a cooperating witness at trial, Salvatore Maniscalco, that Antico recruited him to rob Louis Antonelli, a jeweler, of $300,000 in jewelry and $200,000 in cash. According to Maniscalco, the robbery was botched and resulted in Antonelli's death. Antico had been acquitted at trial of charges of robbery conspiracy and attempted robbery in connection with this scheme.

**DISCUSSION**

1. Sufficiency of the Evidence

Antico argues that there was insufficient evidence that he agreed to extort money from or rob Gulinello, which constituted one of the relevant predicate acts in the racketeering charge.[3] A defendant who challenges the sufficiency of the evidence after a conviction "bears a heavy burden," United States v. Desnoyers, 637 F.3d 105, 109 (2d Cir. 2011) (quotation marks omitted), and we "view[] the evidence in the light most favorable to the prosecution," United States v. Heras, 609 F.3d 101, 105 (2d Cir. 2010) (quotation mark omitted). Under this "exceedingly deferential standard of review," United States v. Hassan, 578 F.3d 108, 126 (2d Cir. 2008), we will affirm the conviction if "any rational trier of fact could have found the

---

[2] The District Court also imposed a term of sixty months' imprisonment on the conviction for illegal gambling, to run concurrently with the 108-month sentence imposed for Count One.

[3] Antico does not dispute that sufficient evidence existed to support the jury's finding that he participated in illegal gambling, which constituted one of the predicate acts in Count One.

11

essential elements of the crime beyond a reasonable doubt," Heras, 609 F.3d at 105 (quotation mark omitted).

Under New York law, a person is guilty of conspiracy in the fourth degree "when, with intent that conduct constituting . . . a class B or class C felony be performed, he or she agrees with one or more persons to engage in or cause the performance of such conduct." N.Y. Penal Law § 105.10(1). A conspiracy charge "require[s] the government to prove, beyond a reasonable doubt, that the defendant knew the specific nature of the conspiracy or underlying crime. Proof that the defendant knew that some crime would be committed is not enough." United States v. Friedman, 300 F.3d 111, 124 (2d Cir. 2002) (citations omitted). N.Y. Penal Law § 160.10(1) provides that a person is guilty of robbery in the second degree, a class C felony, when "he forcibly steals property" and is "aided by another person actually present." N.Y. Penal Law § 160.10(1). To "forcibly steal[]" means to "use[] or threaten[] the immediate use of physical force upon another person," N.Y. Penal Law § 160.00, though "[t]he threatened use of force may be implicit . . . when viewed under the totality of facts." People v. Lopez, 555 N.Y.S.2d 444, 445 (App. Div. 2d Dep't 1990).

"The traditional deference accorded to a jury's verdict is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (alteration in original) (quotation marks omitted). Further, in a conspiracy case, as in any other, "the government is entitled to prove its case solely through circumstantial evidence." United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004). To the extent that the Government relies

on circumstantial evidence of a defendant's participation in a conspiracy, however, we have cautioned that such

> circumstantial evidence of knowledge and specific intent sufficient to sustain a conviction must include some indicia of the specific elements of the underlying crime, such as proof of a defendant's knowledge or intent through evidence that the defendant participated in conversations directly related to the substance of the conspiracy, . . . proof that a defendant exercised authority within the conspiracy itself, . . . or a defendant's statements explicitly confirming the nature of the activity in which the co-conspirators were engaged.

Friedman, 300 F.3d at 126 (quotation marks and brackets omitted).

Particularly when viewed in chronological order, the recorded telephone conversations involving Barrafato, Lento, Martino and Antico constitute circumstantial evidence that the group planned together to rob Gulinello. See App. 29 (Barrafato informing Lento on June 28, 2008 that "Big Nose" said they'd both have money soon); App. 59 (Antico telling Barrafato on July 9 to "start movin' around"); App. 38-39 (Barrafato telling Antico on July 11, "We're puttin' somethin' together with that . . . thing over there."); App. 42-44 (Barrafato discussing with Martino on July 12 the possible recruitment of "Paulie" to help get "maybe 20" from "the guy that hit the Pick Six for a million point six"); App. 65 (Barrafato telling Antico on July 12, "[W]e're gonna, uh, do it this week," stating that he wanted to "go over it with" Antico beforehand, and Antico agreeing); App. 49-50 (Barrafato enlisting Lento on July 12 to work with him and Martino on a matter that he previously discussed with Antico).

The Government also introduced direct evidence of Antico's involvement in the conspiracy to rob Gulinello. During the recorded conversation between Antico and Barrafato on July 16, 2008, Antico specifically asked, "You're gonna rob anybody?" App. 56. Barrafato

13

responded, "Yeah, yeah, yeah," and both laughed. While it may be true, as Antico maintains, that one interpretation of this conversation is that Antico and Barrafato were joking, a rational juror also could reasonably have viewed the conversation as referencing Barrafato's delays in robbing Gulinello and reflecting the two men's agreement to rob Gulinello within the meaning of New York Penal Law §§ 160.10(1) and 105.10(1). See United States v. Torres, 604 F.3d 58, 67 (2d Cir. 2010) ("[W]e defer to a jury's assessments with respect to credibility and conflicting testimony, and to its choice between the competing inferences that can be drawn from the evidence . . . ."). Indeed, the evidence adduced at trial included another telephone conversation in which Barrafato and Antico referred to a "house rob[bery]" without a hint of laughter. See App. 59-60 (Barrafato telling Antico on July 9 that "those guys . . . would look to house rob him," but that Barrafato instructed them not to "go near there").

In light of the prior recorded conversations between Barrafato and Antico from late June through July 12, 2008, the jury could infer that this last telephone exchange on July 16 reflected Antico's instruction to rob Gulinello, followed by Barrafato's affirmative agreement to commit the robbery with the help of other accomplices. See United States v. Rosenblatt, 554 F.2d 36, 38 (2d Cir. 1977). The jury could similarly infer that the planned robbery would involve at least an implicit threat of force based on the "totality of facts" presented, see Lopez, 555 N.Y.S.2d at 445, including (1) the use of the word "rob," the ordinary meaning of which includes the threat of force, see Webster's Third New International Dictionary 1964 (2002) (listing first definition of "rob" as "to take something away from (a person) by force"), (2) the fact that Barrafato recruited three other men to participate in the robbery, and (3) the Coney Island car ride, which appears to have been designed to intimidate Gulinello.

14

In sum, viewing the circumstantial and direct evidence in the light most favorable to the Government, and evaluating that evidence "not in isolation but in conjunction," Torres, 604 F.3d at 67 (quotation marks omitted), we conclude that there was sufficient evidence adduced at trial of Antico's knowing participation in the conspiracy to rob Gulinello in June and July 2008 to sustain the racketeering conspiracy conviction.

2. The Anonymous Jury

Antico challenges the District Court's decision to empanel an anonymous jury both on constitutional grounds and because he contends it abused its discretion in doing so. We have made clear that "when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights." United States v. Quinones, 511 F.3d 289, 295 (2d Cir. 2007) (quoting United States v. Thai, 29 F.3d 785, 800 (2d Cir. 1994)) (quotation marks omitted); see also United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991). Accordingly, we have explained that "a court may order the empaneling of an anonymous jury upon (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected. Within these parameters, the decision whether or not to empanel an anonymous jury is left to the district court's discretion." United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006) (citation and quotation marks omitted). As relevant here, the first requirement may be satisfied by a "demonstrable history or likelihood of obstruction of justice on the part of the defendant or others acting on his behalf." Vario, 943 F.2d at 241.

With these well-established principles in mind, we reject Antico's challenge to the District Court's empanelment of an anonymous jury. The District Court acted well within its

15

discretion when it determined, based on Antico's history of jury tampering and other factors, that the additional protection provided by jury anonymity was warranted. Quinones, 511 F.3d at 295 ("We have identified strong reasons to believe that a jury needed protection in situations where the government demonstrated a defendant's willingness to tamper with the judicial process."). In addition, the District Court took reasonable precautions to minimize any prejudice to Antico and to ensure that his fundamental rights were not undermined by the decision to empanel an anonymous jury. Those precautions included providing the jurors with a neutral explanation of the reasons for which certain measures would be taken during trial and ordering that prospective jurors be given a detailed questionnaire, drafted with input from defense counsel.

### 3. Challenge to Antico's Sentence

Antico also challenges the District Court's decision at sentencing to rely on evidence of Antico's participation in the conspiracy to rob Antonelli, the jeweler, as relevant conduct under Section 1B1.3 of the United States Sentencing Guidelines, despite Antico's acquittal on that charge. Although this finding resulted in a substantial increase in Antico's total offense level under the Guidelines, from 28 to 43, the District Court ultimately imposed a sentence – 108 months' imprisonment – that represented a substantial downward variance from the applicable Guidelines range, based on a recognition that Antico had been acquitted of the relevant conduct. Nevertheless, Antico argues that the District Court erred in relying on the conduct.

A district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct. United States v. Watts, 519 U.S. 148, 156 (1997). Findings of relevant conduct are reviewed for clear error. See United States v. Skys, 637 F.3d 146, 152, 155 (2d Cir. 2011). The District Court did not clearly err in finding by a preponderance of the evidence that Antico was involved

16

in the plan to rob Antonelli.  In finding that the conspiracy to rob Antonelli qualified as relevant conduct, the District Court was entitled to, and did, credit Maniscalco's testimony that Antico was involved in the plan to rob Antonelli and recruited Maniscalco to execute it.  Moreover, the District Court explicitly "decline[d] to impose a sentence at the level called for by the guidelines . . . based on a finding made by a preponderance of the evidence," and stated that Antico "was convicted of less serious offenses, and it is for those offenses that he is and should be sentenced."

Having concluded that Antico's sentence is procedurally reasonable, we next consider whether the sentence is substantively reasonable.  Antico principally submits that his 108-month sentence was substantively unreasonable given the "low level" nature of the crimes of which he was convicted, his age (75), the fact that he is currently serving a separate term of imprisonment for a racketeering conviction, and the District Court's partial reliance on the Antonelli robbery, of which Antico was acquitted.  Even assuming that some of these factors militate slightly in Antico's favor, the District Court was entitled to conclude that all of the remaining factors warranted a higher sentence.  In any event, as we have already observed, the 108-month sentence represented a significant downward variance from the applicable Guidelines range.  We therefore reject Antico's challenge to the substantive reasonableness of his sentence.

## CONCLUSION

We have considered Antico's remaining arguments and conclude that they are without merit.  For the foregoing reasons, we AFFIRM the judgment of the District Court.

POOLER, *Circuit Judge*, concurring in part and dissenting in part:

I join the majority opinion fully as to Parts 2 and 3. I respectfully dissent as to Part 1, Antico's challenge to the sufficiency of the evidence. That Antico was engaged in a conspiracy to commit a crime, I have no doubt. The trial evidence demonstrated unequivocally that he was involved in a conspiracy that had as its object divesting Gulinello of his money. But the evidence that the crime Antico contemplated committing against Gulinello was robbery within the meaning of New York Penal Law §160.10(1) was much scarcer—so scarce that, even in light of the "exceedingly deferential standard of review," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008), his conviction cannot be sustained.

Though the majority repeatedly characterizes the wiretaps as demonstrating that Antico conspired to "rob" Gulinello, e.g., Maj. Op. 6, 7, 14, at most they demonstrate that Antico conspired to commit *a* crime—not that the contemplated crime was robbery as it is defined by the New York Penal Law. As the majority recognizes, "[p]roof that the defendant knew that *some* crime would be committed is not enough." *United States v. Friedman*, 300 F.3d 111, 124 (2d Cir. 2002). Rather, "[c]harges of . . . conspiracy . . . require the Government to prove, beyond a reasonable doubt, that the defendant knew the specific nature of the conspiracy or underlying crime." *Id.* It is proof that the specific nature of the crime Antico conspired to commit was New York robbery which is lacking in this case.

To my mind, the only evidence, meager though it is, that connects Antico to a conspiracy to *rob* Gulinello, as opposed to a conspiracy to commit any of a number of other crimes against him, is the July 16, 2008, conversation in which Antico asked Barrafato if he was "gonna rob anybody." App. 56. The majority concludes that, in light of the other evidence, a "rational juror

1

. . . could reasonably have viewed th[is] conversation as referencing Barrafato's delays in robbing Gulinello and reflecting the two men's agreement to rob Gulinello within the meaning of New York Penal Law §§ 160.10(1) and 105.10." Maj. Op. 15. I fail to see how this is so. Conspiracy to commit robbery under Sections 160.10(1) and 105.10 requires proof that, inter alia, a defendant conspired to "forcibly steal[] property." N.Y. Penal Law § 160.10(1); *id.* § 105.10. Under New York law, "[a] person forcibly steals property and commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person . . . ." *Id.* § 160.00. No evidence presented in this case allowed a rational juror to conclude that Antico conspired to "use[] or threaten[] the immediate use of physical force" against Gulinello in order to take his property. As Antico notes in his briefing, even within the universe of crimes, the word "rob," as it is commonly used, may mean "burglarize" or simply "steal," neither of which necessarily requires the use or threat of force under New York law. *See* N.Y. Penal Law §§ 140.20 et seq. (defining burglary); *id.* §§ 155.00 et seq. (defining larceny); Appellant's Br. 32-33. That Antico asked if Barrafato was going to "rob" someone is not proof beyond a reasonable doubt that he was conspiring with him to use or threaten immediate physical force against Gulinello.

Put another way, robbery, as it is defined by the New York Penal Law, is a term of art. Without some evidence in the record supporting the conclusion that Antico's use of it encompassed the elements that make up that crime under New York law, reliance on it alone to prove Antico conspired to commit that crime—and no other—cannot be sustained. The government was obligated to give the jury something to support the conclusion that Antico conspired to rob Gulinello within the meaning of Section 160.10(1), rather than merely to "rob"

2

him in any one of the sorts of other ways a person can be divested of his or her money without the use or threat of force. If, for example, Barrafato had referenced the use of force against Gulinello in discussing the plot, even if not to Antico, the jury's conclusion that Antico conspired to rob Gulinello within the meaning of Section 160.10(1) might be better supported. But the word "rob" is not a magic incantation; a solitary colloquial use cannot suffice as proof beyond a reasonable doubt that the speaker intends every part of its specialized meaning. The record here is empty of any context that could allow the jury to conclude that Antico did, in fact, conspire to commit robbery as it is defined by Section 160.10(1).

The majority's reliance on the Coney Island car ride is similarly unavailing. Even assuming it constituted evidence of a threat of force, at most it was evidence of a threat of *future*, rather than *immediate* harm. Under the New York Penal Law, "[t]he obtaining of property by means of a threatened physical injury *in futuro* is no longer robbery, but larceny by extortion." *People v. Woods*, 41 N.Y.2d 279, 281 (1977). *Compare* N.Y. Pen. Law § 155.05(e)(i) ("A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him *a fear* that, if the property is not so delivered, the actor or another will . . . [c]ause physical injury to some person *in the future* . . . ." (emphasis added)), *with* N.Y. Penal Law § 160.00 ("A person forcibly steals property and commits robbery when, in the course of committing a larceny, he *uses or threatens the immediate use* of physical force . . . ." (emphasis added)); *see also People v. Chung-Li Wang*, 625 N.Y.S.2d 413, 414 (N.Y. Sup. Ct. 1995) ("The distinction between robbery and extortion is often a fine line, defined by the threat of immediate or of future injury."). Nothing about the car ride, "intimidating," Maj. Op. 15, though it may have been, constituted evidence of an intent to

3

subject Gulinello to force or to the threat of the *immediate* use of force. At worst, it was a threat of the future use of force, which under New York law is evidence of extortion, rather than robbery—the former crime being abandoned by the majority as a means of upholding Antico's conviction. But adding a modicum of evidence that Antico intended to extort Gulinello does not salvage the government's insufficient case that Antico intended to rob him. Insufficient evidence of one crime and insufficient evidence of another with distinct elements does not somehow combine to form proof beyond a reasonable doubt. The car ride was relevant only insofar as it was evidence Antico was conspiring to commit *some* crime, but it was not, and could not be, evidence that this crime was robbery.

While the evidence in this case clearly supported a conclusion that Antico intended to commit a crime, it equally supported the conclusion that the crime was one other than "robbery" as defined by Section 160.10(1). And "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn,* 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted). Given the slender thread on which this conviction hangs—a single use of the word "rob" as a substitute for any showing of intent as to all the elements of Section 160.10—I have no trouble concluding that the evidence in this case equally supported a theory that Antico and his associates intended to get at Gulinello's money in ways other than robbery and extortion, making a theory of legal (if not moral) innocence equally supportable. I must conclude, then, that a reasonable jury would necessarily have entertained a reasonable doubt.

4

I recognize that such a conclusion is unsatisfying, not least because Antico clearly conspired to commit a crime, and because, given his mob pedigree, the contemplated crime probably involved the use or threat of force.  But it does "not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty."  *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993).  Because that is the most the government proved in this case, I respectfully dissent.