**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued: January 28, 2016          Decided: July 7, 2016)

Docket No. 14-4156-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

MICHAEL BOUCHARD,

*Defendant-Appellant*.

_____

Before:

PARKER, LYNCH, and LOHIER, *Circuit Judges.*

In this mortgage fraud case, Michael Bouchard, a former attorney, appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Northern District of New York (Mordue, J.). Bouchard was convicted of filing a false statement with a federally insured financial institution, in violation of 18 U.S.C. § 1014; conspiring to do so, in violation of 18 U.S.C. § 371; and bank fraud, in violation of 18 U.S.C. § 1344. The substantive counts on which Bouchard was convicted involved statements made to BNC Mortgage ("BNC"), which itself was not a federally insured financial institution. The District Court held that the federally insured status of BNC's parent company supported the substantive counts of conviction. We disagree, and

therefore **REVERSE** Bouchard's convictions on the substantive counts. Because the conspiracy count involved fraudulent misstatements made directly to a federally insured bank, we **AFFIRM** Bouchard's conviction on the conspiracy count and **REMAND** for resentencing.

NATHANIEL Z. MARMUR, The Law Offices of Nathaniel Z. Marmur, PLLC, New York, NY, *for Defendant–Appellant.*

THOMAS E. BOOTH (Steven D. Clymer, Assistant United States Attorney, *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, NY; Leslie R. Caldwell, Assistant Attorney General, and Sung-Hee Suh, Deputy Assistant Attorney General, *on the brief*), Department of Justice, Washington, DC, *for Appellee.*

LOHIER, *Circuit Judge*:

Michael Bouchard appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Northern District of New York (Mordue, J.), finding him guilty of one count of conspiring to file false statements with a federally insured financial institution, one count of filing a false statement with a federally insured financial institution, and two counts of bank fraud. All four counts of conviction stemmed from Bouchard's role as a closing attorney in several real estate transactions in upstate New York from approximately 2001 until 2007, when mortgage fraud schemes were especially rampant. As part of these transactions, the Government charged, Bouchard and others fraudulently

misrepresented closing prices and other important details of the real estate sales.

We focus primarily on Bouchard's challenge to the three substantive counts of conviction involving activity directed at BNC Mortgage ("BNC"). Although BNC was a mortgage lender, not a federally insured financial institution, its parent company, Lehman Brothers, was a federally insured financial institution. In this case, the substantive counts required the Government to prove that Bouchard intended to defraud or obtain the property of a "financial institution," 18 U.S.C. § 1344, or to "influenc[e] in any way the action" of a bank referenced in 18 U.S.C. § 1014. The principal question on appeal is whether evidence of fraudulent activity directed at BNC is enough to support convictions under § 1344 and § 1014 solely by virtue of the fact that BNC was owned by a federally insured financial institution. We hold that it is not, and we accordingly reverse Bouchard's convictions on the three substantive counts. By contrast, the conspiracy count of conviction involved fraudulent misstatements made directly to a federally insured bank. We therefore affirm Bouchard's conviction on that count and remand for resentencing.

**BACKGROUND**

A. <u>The Fraudulent Schemes</u>

Because the jury found Bouchard guilty of all the charges against him, we view the evidence in the light most favorable to the Government. See <u>United States v. Facen</u>, 812 F.3d 280, 283 (2d Cir. 2016).

Bouchard began practicing law in 1988.  In 2001 he opened his own law firm devoted largely to real estate transactions.  The charges against Bouchard resulted from an investigation into two fraudulent real estate schemes in which he and his law firm participated from approximately 2001 until 2007.  The "Team Title" scheme was run by Francis "Tom" Disonell and Matthew Kupic and was named after a company the two men owned.[1]  The "PB Enterprises" scheme was named after a company run by Kevin O'Connell and Michael Crowley.  As part of that scheme, O'Connell and Crowley either directly resold or brokered the sales of properties at

[1] This scheme involved purchasing distressed properties from homeowners at low values and then reselling them at artificially inflated values to prospective buyers for no down payment, while falsely representing to lenders at closing that the buyers were providing a down payment.  Based on these misrepresentations, Kupic and Disonell were able to obtain higher mortgages than they would have otherwise.  They distributed the leftover cash from the higher mortgage proceeds to other entities and to themselves as "consulting fees."

inflated prices and fraudulently obtained mortgages for the higher selling prices. At the real estate closings, O'Connell and Crowley used so-called "double HUDs" – in effect, two "HUD-1" forms,[2] each of which purported to summarize the disbursements made from the funds provided by the lender for the deal. One HUD-1 form reflected the actual, lower selling price, but was submitted only to the seller; the other HUD-1 falsely contained the artificially high purchase price and was submitted on the same day to the lender for the loan payment. The latter HUD-1 made it appear that most of the proceeds of the mortgage would be used to compensate the seller. In reality O'Connell and Crowley diverted the mortgage proceeds to themselves and to the buyer. Disonell, Kupic, O'Connell, and Crowley eventually testified at Bouchard's trial as cooperating witnesses for the Government.

Bouchard and two paralegals he hired, Laurie Hinds and Malissa Edgerton, were closely involved in both the Team Title and the PB Enterprises real estate schemes. The focus of this appeal, however, is on

---

[2] A HUD-1 form is a Housing and Urban Development settlement form used in closing a property sale that details the costs and fees associated with a mortgage loan. See United States v. Kerley, 784 F.3d 327, 333 n.2 (6th Cir. 2015).

the PB Enterprises scheme that formed the basis for the counts of conviction. In that scheme, Bouchard's law firm served as the closing attorney or "closing agent" purporting to represent the lenders for several transactions. The law firm was therefore responsible for disbursing mortgage funds, ensuring that the closing instructions from the lender were followed before disbursing any funds, and ensuring the accuracy of representations to the lender on the HUD-1 regarding the transaction (such as the sale price and how much money the buyer put down). Typically, Bouchard or his paralegals signed and submitted to the lender a HUD-1 certifying that the form was "a true and accurate statement of all receipts and disbursements made on [their] account or by [them] in this transaction." But in fact each of these certifications was false: the HUD-1s either contained incorrect sales prices or falsely represented that the buyers had made a down payment.

Bouchard personally attended the closings and signed fake HUD-1 forms in connection with at least two real estate transactions for which he was convicted. The first of these transactions took place in March 2005, when PB Enterprises arranged for the sale of a property in Troy, New York

to a purported buyer, Brian Haskins. In connection with the sale, Bouchard signed two obviously different HUD-1 forms, one listing the sale price as $35,000 and the other falsely listing an $85,000 sale price. The false HUD-1 form also represented that Haskins had deposited a down payment of about $17,000 at closing, when in fact he had not. After the closing, Bouchard's office submitted the false HUD-1 form to BNC, which provided Haskins a mortgage of $76,500 – over $40,000 more than the actual sale price. Bouchard then disbursed funds from the mortgage proceeds, including a $33,172.03 check made payable to Haskins that Bouchard gave to Crowley, who deposited it into his personal account.

The second transaction occurred in April 2005 and, like the first, closed at Bouchard's law firm. Bouchard was present at the sale's closing and signed two HUD-1 forms in connection with a sale of property located at 4 Kaatskill Way in Ballston Spa, New York. One of the HUD-1 forms represented that the sale price was $224,000, while the other HUD-1 form, ultimately submitted to BNC, certified a higher sale price of $240,000.

Bouchard's personal involvement in signing and submitting false HUD-1 forms was only part of the Government's evidence that he knew

the schemes were fraudulent.  At various times, Bouchard also made direct statements that together demonstrated his knowledge and culpability.  For example, Bouchard was unfazed when Disonell initially confided to Bouchard that Crowley and O'Connell, the masterminds of the PB Enterprises fraud, used "double HUDs" at closings and then asked if Bouchard wanted their business.  O'Connell later confirmed to Bouchard that he and Crowley "wanted to basically buy the property, have two closings in one day where we were buying it from somebody at a lower price and then reselling it at a higher price."  Bouchard responded that it "wouldn't be a problem" and agreed to team with O'Connell and Crowley as the closing agent.  Bouchard, O'Connell, and Crowley also agreed that Bouchard's firm would follow up each closing by issuing a check to the buyer reflecting the difference between the actual and the inflated sale price.  And Hinds, one of Bouchard's paralegals, later testified that Bouchard authorized disbursements to parties other than those listed on the HUD-1 forms.

Finally, in July 2005, after the fraudulent schemes had stretched for more than four years, federal agents interviewed Bouchard as part of a

criminal investigation of Disonell and Kupic. During the interview Bouchard admitted that "in about 50 percent of his closings" the fund disbursements were "different than indicated on the HUD-1 form" at the buyer's and seller's direction. While acknowledging that the disbursements were "weird," Bouchard insisted that they reflected "standard practice" in the real estate industry and explained that he "was only concerned that his corporate accounts that show the money that would come in from the lender had zeroed out at the end of the transaction."

B. <u>The Defrauded Lenders</u>

Two of the principal lenders victimized by the mortgage fraud schemes were Fremont Investment and Loan ("Fremont") and BNC. Fremont and its depository accounts were insured by the Federal Deposit Insurance Corporation ("FDIC"). BNC, while not itself federally insured, was wholly owned by Lehman Brothers, which was federally insured and provided BNC with a "warehouse line of credit" to fund BNC's mortgages.

At trial, Bouchard admitted that he knew Lehman Brothers and Fremont were both federally insured but testified that he believed that

BNC was not insured (and, as explained above, it is not). There was no evidence that Bouchard knew either that BNC was owned by Lehman Brothers or that Lehman Brothers was involved in any of the loans at issue.

C. Procedural History

1. The Jury Verdict

The jury convicted Bouchard of the conspiracy count (Count One), two substantive bank fraud counts under § 1344 that arose from transactions in which Bouchard personally attended the closing and signed the fraudulent HUD-1s (Counts Seven and Nineteen), and the § 1014 false statements count (Count Twenty-Four), which arose from the same transaction as Count Seven. All three substantive counts of conviction involved mortgages funded by BNC.

The jury acquitted Bouchard of all the remaining counts, however, including several counts of bank fraud. One of the counts of acquittal (Count Seventeen) involved a false HUD-1 submitted to Fremont.

2. The Rule 33 Motion

Soon after the jury verdict, O'Connell told the Government that his testimony about meeting Bouchard was false and that, in fact, "he never

met Michael Bouchard." O'Connell explained that he had initially so informed the trial prosecutors, one of whom threatened that "if you do not tell us you met with Michael Bouchard we can't help you." After learning about O'Connell's post-trial disclosure to the Government, Bouchard moved for a judgment of acquittal or, in the alternative, for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. Among other things, Bouchard argued that he would have been acquitted of all the charges against him absent O'Connell's perjured testimony. He separately argued that there was insufficient evidence that BNC was a federally insured financial institution under § 1344 or § 1014.

After a hearing on the perjury issue, the District Court denied Bouchard's motion. First, the court assumed without deciding that O'Connell had committed perjury at trial. It concluded, however, that the Government was unaware of the perjury and that Bouchard failed to demonstrate that, but for the perjured testimony, he would most likely not have been convicted. Second, after considering whether the Government needed to prove that BNC itself was a covered institution under § 1344 or § 1014, the District Court found that Bouchard in any event defrauded

BNC's parent company, Lehman Brothers, which indisputably was a federally insured financial institution, and that Bouchard therefore could be liable for bank fraud.  In support of that finding, the District Court pointed to (1) Bouchard's "intent to defraud," (2) "the integrated transaction involving funds from Lehman Brother[s]," and (3) "the financial injury to which Lehman Brothers was exposed as a result of its ownership of BNC and its provision of money to fund the loan[s]."

In denying Bouchard's Rule 33 motion with respect to the § 1014 false statement count, the District Court pointed out that Bouchard "was an experienced real estate attorney" who "acted as the 'bank's attorney' for numerous transactions over many years."  Evidence of Bouchard's background, the court explained, was "sufficient to create an inference . . . that [Bouchard] knew his statements would influence a bank."

### 3. Sentencing

Bouchard's presentence report ("PSR") recommended a Guidelines range of 87 to 108 months based on an offense level of 29 and a criminal history category of I.  The PSR calculations were premised in part on conduct for which Bouchard had been acquitted.  At sentencing, the

District Court simply adopted the PSR's findings and guidelines calculation without separately finding that Bouchard had committed the acquitted conduct. After determining that the loss amount associated with Bouchard's crimes far exceeded his personal gain, the District Court downwardly departed from the applicable range and sentenced Bouchard to concurrent terms of 48 months on each count of conviction.

This appeal followed.

**DISCUSSION**

A. <u>Sufficiency of the Evidence</u>

Section 1344 criminalizes schemes to defraud, or schemes to obtain the money of, a "financial institution." The statute provides in full: "Whoever knowingly executes, or attempts to execute, a scheme or artifice— (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1344. Prior to 2009, the term "financial institution" was defined to

include insured depository institutions of the FDIC, but not mortgage lenders. See id. § 20(1). Similarly, Section 1014 makes it a crime to knowingly make "any false statement or report . . . for the purpose of influencing in any way the action" of enumerated financial entities, which, at the time the schemes were undertaken prior to 2009, included "any institution the accounts of which are insured by the [FDIC]," id. § 1014, but again not mortgage lenders.

As is now well known, the subprime mortgage crisis some years ago threatened the financial stability of many federally insured financial institutions. The crisis prompted Congress in 2009 to amend both § 20 (which defines financial institutions for purposes of § 1344) and § 1014 to cover mortgage lending institutions specifically. Fraud Enforcement and Recovery Act ("FERA") of 2009, 123 Stat. 1617. Timing is everything: the conduct for which Bouchard was convicted occurred prior to 2009.

We therefore consider whether Bouchard's conduct violated § 1344 and § 1014 before the enactment of FERA, recognizing that BNC, though itself not federally insured, was owned by a federally insured financial institution (Lehman Brothers), while Fremont was federally insured.

14

Because the substantive counts of conviction involved activity directed at BNC only, we conclude that there was insufficient evidence that Bouchard intended to defraud or obtain the property of a "financial institution," as required by § 1344, or to "influenc[e] in any way the action" of an institution covered by § 1014.  We therefore reverse his convictions on those counts.  We separately conclude that part of the conspiracy count of conviction involved statements aimed at Fremont, which both parties agree was a federally insured financial institution.  We therefore affirm Bouchard's conviction on that count.

      1.  Section 1344(1)

As noted, the federal bank fraud statute makes criminal the "knowing[] execut[ion]" of a scheme to "defraud a financial institution." 18 U.S.C. § 1344.  Prior to Loughrin v. United States, 134 S. Ct. 2384 (2014), we interpreted § 1344 as a whole to be "a specific intent crime requiring proof of an intent to victimize a bank by fraud," meaning that "[a] federally insured or chartered bank must be the actual or intended victim of the scheme."  United States v. Nkansah, 699 F.3d 743, 748 (2d Cir. 2012) (quotation marks omitted).  The Supreme Court in Loughrin rejected that

interpretation, holding instead that § 1344(2) does not require an intent to defraud a bank. It confirmed, however, that § 1344(1) "includes the requirement that a defendant intend to 'defraud a financial institution'; indeed, that is § 1344(1)'s whole sum and substance." Loughrin, 134 S. Ct. at 2389–90.

The Government concedes there was no evidence that Bouchard specifically intended to defraud Lehman Brothers or was even aware of Lehman Brothers' role in the transactions involving BNC. Relying on United States v. Brandon, 17 F.3d 409 (1st Cir. 1994), the Government nevertheless argues that it satisfied the "intent to defraud" element. Bouchard's "targeting of BNC, an uninsured mortgage broker," it claims, "directly affected Lehman Brothers because Lehman Brothers funded BNC's loans and was liable for its losses." Appellee's Br. 15. We are not persuaded.

Brandon also involved a fraudulent mortgage scheme. The defendants targeted brokers and servicing agents acting on behalf of a federally insured bank that ultimately approved and provided the relevant mortgages in that case. Brandon, 17 F.3d at 418–19. The defendants

argued that "there was no violation of § 1344 because the scheme to defraud was not knowingly targeted at a federally insured financial institution, but instead at the non-federally insured mortgage brokers." Id. at 426. The First Circuit rejected their argument, explaining that "the government does not have to show the alleged scheme was directed solely toward a particular institution; it is sufficient to show that defendant knowingly executed a fraudulent scheme that exposed a federally insured bank to a risk of loss." Id. (emphasis in original); see also id. at 426–27 (evidence that the defendants "fraudulently evaded a known down payment requirement, whether thought to be imposed" by the brokers, the agents, or the insured bank itself, "is sufficient to support a bank fraud conviction," so long as "the government . . . establish[es] that a federally insured bank . . . was victimized or exposed to a risk of loss by the scheme to defraud"); United States v. Walsh, 75 F.3d 1, 9 (1st Cir. 1996) (explaining that "Brandon . . . confirm[s] that a defendant can violate section 1344 by submitting the dishonest loan application to an entity which is not itself a federally insured institution" but that is funded by such an institution).

17

Brandon conflicts with our precedent insofar as it holds, as the Government claims, that a defendant satisfies the intent element of § 1344(1) merely by submitting the dishonest loan application to an entity which is not itself a federally insured institution without also intending to deceive the entity's insured owner. Contrary to Brandon, we have held that § 1344(1) requires the Government to show that a defendant intended to defraud the financial institution itself. See United States v. Stavroulakis, 952 F.2d 686, 694 (2d Cir. 1992); United States v. Rodriguez, 140 F.3d 163, 168 (2d Cir. 1998); United States v. Laljie, 184 F.3d 180, 189-90 (2d Cir. 1999). To be sure, the Government is not required to prove that a defendant knows that the entity targeted by the fraud is a federally insured bank. See Nkansah, 699 F.3d at 758 (Lynch, J., concurring) (noting that "for the federal government to exercise its criminal powers over an individual, it is not logically necessary for that person to know or intend that she is transgressing a particularly federal interest" (emphasis in original)). But it remains true that a defendant cannot be convicted of violating § 1344(1) merely because he intends to defraud an entity, like BNC, that is not in fact covered by the statute.

Brandon also appears to us to conflict with Loughrin, which, though focused on § 1344(2), suggests that a defendant must intend to defraud a bank in order to be convicted under § 1344(1). In Loughrin, the Supreme Court affirmed the defendant's conviction for bank fraud, even though his "intent to deceive ran only to [a non-federally insured entity], and not to any of the banks on which his altered checks were drawn." 134 S. Ct. at 2389. The Court rejected the defendant's argument that § 1344(2) required the Government to prove "not just that a defendant intended to obtain bank property (as the jury . . . found), but also that he specifically intended to deceive a bank." Id. The defendant's reading of § 1344(2) was untenable, the Court stated, because it would impose the same requirements on a conviction under § 1344(2) as apply to a conviction under § 1344(1) and thus "would render § 1344's second clause superfluous." Id. at 2389. In other words, the Court reasoned, § 1344(2) imposes no requirement that a defendant "specifically intend[] to deceive a bank" because § 1344(1) already requires that specific intent. Id.

For these reasons, we decline to adopt the holding in <u>Brandon</u> and conclude that the evidence was insufficient to sustain Bouchard's conviction under § 1344(1).

### 2. Section 1344(2)

The Government argues in the alternative that the evidence was sufficient to convict Bouchard under § 1344(2).[3]  In rejecting this argument, we are again guided by <u>Loughrin</u>.  Under § 1344(2), the Government must prove "that the defendant intend[ed] 'to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution'" – that is, "inten[ded] 'to obtain bank property.'"  <u>Id.</u> at 2389.  Although the Supreme Court ultimately determined that Loughrin had waived the argument that he did not "intend" to obtain bank property, <u>id.</u> at 2389 n.3, the Court assumed that "intent 'to obtain bank property'" is an element of a conviction under § 1344(2) and that a defendant must at least

---

[3] Bouchard initially argued that we should only consider the sufficiency of the evidence under § 1344(1), but before oral argument he withdrew the argument based on the Supreme Court's supervening decision in <u>Musacchio v. United States</u>, 136 S. Ct. 709, 715 (2016).  <u>See</u> <u>United States v. Bouchard</u>, No. 14-4156-cr (2d Cir.), ECF Docket No. 72.

know that the property belongs to or is under the custody or control of a bank.[4] See id. at 2389, 2393 n.6.

At oral argument the Government urged that BNC itself may loosely be regarded as a bank or financial institution within the meaning of 18 U.S.C. § 20 because "it is colloquially [a bank or financial institution]. . . [insofar as] it lends money." We reject this novel argument. First, a "financial institution" is not a loose or colloquial term, but a term of precise definition that can lead to grave criminal consequences. Second, we are mindful that § 1344(2) should not be read to "federaliz[e] frauds that are only tangentially related to the banking system," which is § 1344's core concern. Loughrin, 134 S. Ct. at 2393 (quotation marks omitted). For that reason, and particularly when bank subsidiaries may be engaged in activities far afield of the core functions of our federal banking system, it is important (absent legislative direction to the contrary) to distinguish subsidiaries of banks from the banks themselves. See United States v. Bennett, 621 F.3d 1131, 1136 (9th Cir. 2010) (banks are distinct legal entities from their subsidiaries for the purposes of § 1344(2)); see also United States

---

[4] As with § 1344(1), a defendant need not know that the bank is federally insured, nor aim to obtain the property of one bank in particular.

v. White, 882 F.2d 250, 253 (7th Cir. 1989) (in the context of § 1014, "it would be . . . perilous to assume that Congress wanted to extend the statute's protection to [financial institutions'] affiliates, when so far as appears there is no (or only the most attenuated) federal stake in preventing fraud against affiliates of a federally insured bank, as distinct from fraud against the bank itself").

We also note that Congress has been willing and able to amend the bank fraud statute to cover new conduct by new actors that it determines does directly affect the banking system. For example, as we have already mentioned, in 2009 Congress amended both § 20 and § 1014 to cover mortgage lending institutions specifically. FERA, 123 Stat. 1617 (2009). In doing so, Congress appears to have understood that § 1344 (through § 20) and § 1014 "only applie[d] to Federal agencies, banks, and credit associations and d[id] not necessarily extend to private mortgage lending businesses, even if they are handling federally-regulated or federally-insured mortgages." See S. Rep. 111-10, 2009 U.S.C.C.A.N. 430, 432. As the Senate committee report on FERA explained, "the bill amend[ed] the definition of 'financial institution' in the criminal code . . . in order to

extend Federal fraud laws to mortgage lending businesses that are not directly regulated or insured by the Federal Government." Id. at 432.

At the time of the charged conduct, all of which occurred before the 2009 congressional amendments, BNC was not a covered institution. Of course, the Government might have been able to prove that Bouchard knew that money from mortgage lenders came from banks by virtue of his knowledge of the industry. But it failed to make this argument or proffer evidence of Bouchard's extensive knowledge of the real estate and mortgage lending industry as a reason to convict him at trial.

### 3. Section 1014 (Count Twenty-Four)

Bouchard also challenges the sufficiency of the evidence supporting his conviction on Count Twenty-Four, which charged him with making false statements to a bank in connection with the March 2005 transaction involving the property in Troy, New York. As both the Government and Bouchard agree, § 1014 does not require the Government to prove that a defendant knew that the bank is insured by the FDIC, but it does require the Government to prove that the defendant "kn[ew] that it was a bank . . . to which he has made the false statement in his application for a loan" and

that he "intended to influence." United States v. Sabatino, 485 F.2d 540, 544 (2d Cir. 1973).

The HUD-1 that Bouchard signed and submitted in connection with the March 2005 transaction did not reveal that the loan would ultimately be financed by Lehman Brothers. It listed only BNC as the lender. As we have suggested the Government might have been able to argue with respect to the § 1344 charges, it now contends that Bouchard "must have known" that the loan would ultimately be financed by Lehman Brothers because of his experience in the real estate industry. See United States v. Grasso, 724 F.3d 1077, 1081, 1088 (9th Cir. 2013) (a jury could reasonably conclude that the defendant knew that his false statements would influence an insured bank because, among other things, he "was an experienced real estate agent who . . . was well-versed in the mortgage lending process" and who "targeted banks" with lenient standards for their lending agents). Under the circumstances of this case, however, we reject the Government's argument.

First, as we explained above, the Government never presented this theory of Bouchard's knowledge to the jury. We are disinclined to affirm a

conviction based on a theory that was not advanced regarding a critical element. See United States v. Rigas, 490 F.3d 208, 231 n.29 (2d Cir. 2007). Second, at trial there was no evidence of what a real estate attorney with Bouchard's experience would have known regarding the connection between non-federally insured brokers or lenders (like BNC) and federally insured institutions (like Lehman Brothers). Nor was there any evidence that Bouchard deliberately "targeted banks" that imposed lenient standards for their lending agents. See Grasso, 724 F.3d at 1081. Accordingly, even if we entertained the Government's theory for the first time on appeal, we would conclude that there was insufficient evidence at trial to support it.

We therefore reverse Bouchard's conviction on Count Twenty-Four for violating § 1014.

### 4. Conspiracy (Count One)

We next turn to Bouchard's conviction on Count One of the indictment, for conspiracy to violate § 1014. Count One charged four overt acts involving the submission of false HUD-1s to three different institutions. Only one of the institutions, Fremont, was proven to be a

federally insured financial institution. Pointing to his acquittal on the substantive count involving the Fremont transaction (Count Seventeen), Bouchard urges us to assume that the jury wrongly convicted on a different overt act involving one or both of the two other victimized institutions that were not proven to be federally insured.

We generally affirm convictions as long as there was sufficient evidence to support one of the theories presented. See Griffin v. United States, 502 U.S. 46, 56-57 (1991). "[I]n the absence of anything in the record to show the contrary, the presumption of law is that the court awarded sentence on the good count only." Id. at 50 (quotation marks omitted); accord United States v. Duncan, 42 F.3d 97, 105 (2d Cir. 1994). We conclude that Bouchard's acquittal on the substantive count is not "to . . . the contrary." Griffin, 502 U.S. at 50. Without a special verdict form demonstrating that the jury convicted on a theory not supported by sufficient evidence, see United States v. Frampton, 382 F.3d 213, 224-25 (2d Cir. 2004), we can easily reconcile the jury's verdict to acquit on the substantive count involving Fremont with its finding that an overt act involving Fremont occurred as part of the conspiracy. The differing

verdicts might, for example, simply reflect the fact that the Fremont closing was attended by one of Bouchard's paralegals rather than Bouchard, and the jury may reasonably have declined to find Bouchard guilty of the substantive count and simultaneously determined that his co-conspirator (the paralegal) committed the overt act charged in the conspiracy count. See United States v. Palmieri, 456 F.2d 9, 12 (2d Cir. 1972).

For these reasons, we affirm Bouchard's conviction on the conspiracy count.

B. O'Connell's Alleged Perjury

We next consider whether Bouchard was entitled to a new trial under Rule 33 of the Federal Rules of Criminal Procedure because of O'Connell's alleged perjury. The trial judge is "in the best position to appraise the possible effect" of newly discovered evidence on the jury's verdict, United States v. Stewart, 433 F.3d 273, 301 (2d Cir. 2006) (quotation marks omitted), and so we review the denial of a Rule 33 motion for abuse of discretion, United States v. Sessa, 711 F.3d 316, 321 (2d Cir. 2013).

In denying Bouchard's Rule 33 motion, the District Court never found that O'Connell in fact committed perjury. But it did find that the

Government lacked knowledge of any perjury. Under those circumstances, even assuming perjury, we must be left with "a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." United States v. Ferguson, 676 F.3d 260, 282 n.19 (2d Cir. 2011) (quotation marks omitted). With that standard in mind, we conclude that the District Court did not abuse its discretion in denying the motion.

First, as Bouchard acknowledges, defense counsel strongly undercut O'Connell's credibility on cross-examination. In particular, on cross-examination O'Connell (1) was unable to recall when and where he had a conversation with Bouchard about payouts not reflected on the HUD-1s, (2) confirmed that he had not had any real conversation with Bouchard, (3) admitted that it "wasn't really [his] role in the company to deal with" Bouchard and that he did not deal directly with Bouchard in connection with any of the closings that were the subject of his testimony on direct examination, and (4) acknowledged that he did not talk to Bouchard about

the use of "double-HUDs."[5]  In sum, the highly equivocal nature of

O'Connell's testimony about meeting with Bouchard "rendered the

significance of his perjury minimal."  United States v. Torres, 128 F.3d 38,

49 (2d Cir. 1997).

Bouchard counters that O'Connell's testimony was unduly

prejudicial because it was used to undermine his own testimony on cross-

examination.  He asserts that the "prosecutor effectively used O'Connell's

perjury to suggest that Bouchard was lying about never having met

O'Connell or Crowley."  Appellant's Reply Br. 19.  But the prosecutor's

cross-examination focused largely on how Bouchard's knowing

participation in the scheme was central to its success, not on O'Connell's

testimony.  And in its jury summation the Government conceded that

O'Connell had not discussed the scheme with Bouchard.  Moreover, we

are satisfied based on our review of the record that there was ample

independent evidence proving that Bouchard was aware of the fraudulent

nature of the schemes.  That evidence included Disonell's testimony that

---

[5] Moreover, Bouchard was able to testify at trial that "[w]e have the transcript from Kevin O'Connell and he said that no such meeting occurred."

29

he disclosed to Bouchard that the closings with O'Connell and Crowley would involve "double HUDs."

We therefore affirm the District Court's denial of Bouchard's Rule 33 motion based on O'Connell's testimony.[6]

---

[6] Because we vacate the judgment of conviction in part and remand for resentencing, we need not address Bouchard's argument that the District Court committed procedural error in calculating his Guidelines range based on acquitted conduct. We nevertheless offer a few words of guidance for resentencing based on acquitted conduct. "A district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct." United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012). With respect to conduct by a co-conspirator, "a district court must make a particularized finding as to whether the activity was foreseeable to the defendant" and must "make a particularized finding of the scope of the criminal activity agreed upon by the defendant." United States v. Studley, 47 F.3d 569, 574 (2d Cir. 1995). This is true even in the case of a conspiracy conviction, because "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." United States v. Getto, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (quotation marks omitted). Insofar as it bases any resentence on acquitted conduct, the District Court must make particularized findings either that Bouchard actually committed the acts or that the acts of his co-conspirators were both foreseeable to him and fell within the scope of criminal activity to which he agreed.

**CONCLUSION**

For the foregoing reasons, we **REVERSE** Bouchard's convictions on Counts Seven, Nineteen, and Twenty-Four, **AFFIRM** his conviction on Count One, and **REMAND** for resentencing.